# EXHIBIT A

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

### KADENWOOD, INC.
### SHAREHOLDER AGREEMENT

This KADENWOOD, INC. SHAREHOLDER AGREEMENT ("**Agreement**"), effective as of __June 7__ __, 2021 (the "**Effective Date**"), is entered into by and among the shareholders set forth on Exhibit A (the "**Shareholders**"), and Kadenwood, Inc., a Delaware corporation (the "**Company**") with respect to the following:

### RECITALS:

**WHEREAS**, the Shareholders beneficially own the number of shares of the outstanding Class A Common Stock or Class S Common Stock of the Company (collectively, the "**Common Stock**") and/or Series B Preferred Stock or Series A Preferred Stock (the "**Preferred Stock**," and collectively with the Common Stock, the "**Shares**") as set forth on Exhibit A.

**WHEREAS**, the Shareholders and the Company desire to provide for (1) certain restrictions on the transfer and disposition of the Shares, and (2) certain other terms, rights, and obligations concerning the Shares and the operations, business, and affairs of the Company, all as more specifically provided herein.

**NOW, THEREFORE**, in consideration of the foregoing, and the mutual agreements and covenants contained herein, the Parties agree as follows:

1. **Definitions.**

As used herein, the following words shall have the following meanings:

1.1 "**Act**" shall mean the Securities Act of 1933, as amended.

1.2 "**Affiliate**" shall mean any Person who directly or indirectly controls, is controlled by, or is under common control with the specified Person. "Control," "controlled" and "controlling" means the power to direct or cause the direction of the management and policies of a Person, and shall be deemed to exist if any Person directly or indirectly owns, controls, or holds the power to vote 50% or more of the voting securities of such other Person.

1.3 "**Agreement**" shall mean this Shareholder Agreement.

1.4 "**Blocker Entity**" means BleichroederKadenwood LLC, a Delaware limited liability company.

1.5 "**Board**" shall mean the Board of Directors of the Company.

1.6 "**Certificate of Incorporation**" means the certificate of incorporation of the Company, as filed on June 2, 2021, with the Delaware Secretary of State, as the same may be amended, modified, supplemented, or restated from time to time.

1.7 "**Change of Control**" means any transaction or series of related transactions consummated involving: (i) the sale, lease, exclusive license, or other disposition of all or substantially all of the assets of the Company; (ii) any merger or consolidation of the Company into or with another person or entity (other than a merger or consolidation effected exclusively to change the Company's domicile), or any other corporate reorganization, in which the stockholder of the Company in their

1

4822-2229-6297

PENGAD 800-631-6989   EXHIBIT
1039
weekes

KW2_100513

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

capacity as such immediately prior to such merger, consolidation or reorganization, own less than a majority of the Company's (or the surviving or successor entity's) outstanding voting power immediately after such merger, consolidation or reorganization (or, if such stockholders beneficially own a majority of the outstanding voting power of the surviving or successor entity as of immediately after such merger, consolidation or reorganization, such surviving or successor entity is not the Company); or (iii) any sale or other transfer by the stockholders of the Company of shares of capital stock representing at least a majority of the Company's outstanding voting power.

1.8     "**Common Units**" means the economic interest in the Company acquired by a Shareholder representing the economic rights of such Shareholder and the Shareholder's permitted assignees and successors to share in distributions of cash and other property from the Company pursuant to the LLC Agreement and labeled as Common Units pursuant to the LLC Agreement, which were exchanged for an equal number of shares of Common Stock upon the Company's Conversion.

1.9     "**Company**" shall mean Kadenwood, Inc., a Delaware corporation, and its successors and assigns.

1.10    "**Company's Notice of Trigger-Related Exercise**" has the meaning set forth in <u>Section 3.5(b)</u>.

1.11    "**Company's Trigger-Related Purchase Option**" has the meaning set forth in <u>Section 3.5(b)</u>.

1.12    "**Company's Option Period**" has the meaning set forth in <u>Section 3.5(b)</u>.

1.13    "**Competitor of the Company**" means any other Person who, as a significant component of their business, cultivates industrial hemp for use in cannabidiol (CBD)-based products, processes industrial hemp into CBD-based products, or manufactures or sells CBD-based products.

1.14    "**Controlling Shareholders**" shall mean the holder(s) of the majority of voting power of the Shares.

1.15    "**Conversion**" means the Company's conversion from a state law limited liability company known as "Kadenwood LLC" to a state law corporation known as "Kadenwood, Inc.", occurring effective as of June 2, 2021.

1.16    "**Davis Financing Holders**" means each of 2013 Davis Family Trust, Douglas B. Weekes IRA, Robert Krakauer, BleichroederKadenwood LLC, Heedfirst Ventures LLC, Roland Family Trust, and the John J Dorsey Revocable Trust of 2006, and each of their Permitted Transferees and transferees in an otherwise Permitted Transfer, as designated on <u>Exhibit A</u>, for so long as each such Person holds Series B Preferred Stock.  Any rights of the Davis Financing Holders in this Agreement shall apply only with respect to those Shares of Series B Preferred Stock designated as such on <u>Exhibit A</u>.

1.17    "**Default Interest Rate**" means the minimum Applicable Federal Rate for loans of an applicable duration at the time any such loan is made.

1.18    "**Disabling Conduct**" means (a) fraud, (b) willful misconduct, (c) commission of a felony, or (d) any other act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing, as determined by the Board, provided, however, that if the conduct involves a Shareholder who serves as a director on the Board, then the determination of whether

2

4822-2229-6297

KW2_100514

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

such Person has been involved in a Disabling Conduct shall be made by a majority of the remaining directors.

1.19    "**Disposition**" (and, in the verb form, "**Dispose**") shall mean any assignment, transfer, sale, exchange, conveyance, disposition, pledge, hypothecation, gift, testamentary disposition, or encumbrance whatsoever, whether voluntary, involuntary, by operation of law, or pursuant to this Agreement.

1.20    "**Dissolution Notice**" has the meaning set forth in Section 3.4(b).

1.21    "**Drag-Along Shareholder**" has the meaning set forth in Section 3.3.

1.22    "**Family**" means a natural Person's spouse, parent, sibling (by blood or adoption), or lineal ancestor or descendent by (blood or adoption) of such Person or such Person's spouse, parent or sibling.

1.23    "**Fiscal Year**" means the Company's taxable year, which shall be a calendar year except as otherwise required by law.

1.24    "**Founder**" means each of Todd Davis, Erick Dickens or Doug Weekes (in each case, either directly or indirectly, including, without limitation, any Family or Affiliates that such Person controls (including, without limitation, Approach Marketing LLC and Piedmont Brand Group, Inc.)) and shall include all Permitted Transferees thereof.

1.25    "**Fourth A&R Effective Date**" means August 19, 2020, the effective date of the Fourth Amended and Restated Limited Liability Company Agreement of Kadenwood LLC.

1.26    "**Healist**" means Present Life Limited, a company incorporated and registered in England and Wales with company number 12072981, and its Permitted Transferees, for so long as such Person holds Series B Preferred Stock.

1.27    "**Healist Group Holders**" means each of Present Life Limited, a company incorporated and registered in England and Wales with company number 12072981, The Craftory, and each of their respective Permitted Transferees, for so long as such Person holds Series B Preferred Stock.

1.28    "**Lien**" shall mean any lien, encumbrance, security interest, charge, mortgage, option, pledge or restriction on transfer of any nature whatsoever.

1.29    "**Liquidation Value**" means an amount, as determined in good faith by the Board, equal to the amount that would be received by the Shareholder whose Shares are subject to the determination of value hereof assuming (a) all Company assets, including its intangible assets, were sold for cash equal to their fair market value, (b) all Company liabilities were satisfied to the extent required by their terms, (c) any special liquidity and related rights of the Special Common Holders were satisfied (including, without limitation, those set forth in the Put/Call Agreement) and (d) the net assets of the Company were distributed to all Shareholders pursuant to the Certificate of Incorporation as a Deemed Liquidation Event (as defined in the Certificate of Incorporation).  For purposes of clarification, because the Liquidation Value of a Shareholder's Shares takes into consideration the distribution priorities of the Shareholders under the Certificate of Incorporation, the Liquidation Value per Unit for one Shareholder may not necessarily be the same as the Liquidation Value for another Shareholder.  The Liquidation Value in all instances shall be determined by the Board in good faith after consultation with the Company's advisors, if any.

3

4822-2229-6297

KW2_100515

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

1.30    "**LLC Agreement**" means that certain Fifth Amended and Restated Limited Liability Company Agreement of Kadenwood LLC, dated as of September 28, 2020.

1.31    "**Majority Approval of Healist Group Holders**" means the written consent or written approval of those Persons holding a majority of the aggregate number of outstanding shares of Series B Preferred Stock held by all Healist Group Holders.

1.32    "**Majority Approval of Series B Holders**" means the written consent or written approval of those Persons holding a majority of the aggregate number of outstanding shares of Series B Preferred Stock held by all Series B Holders.

1.33    "**Majority Approval of Special Common Holders**" means the written consent or written approval of those Persons holding a majority of the aggregate number of outstanding shares of Common Stock held by all Special Common Holders.

1.34    "**Parties**" shall mean the Company and each of the Shareholders. "**Party**" shall mean one of the foregoing.

1.35    "**Percentage Interest**" shall mean, with respect to a Shareholder as of any date, such Shareholder's portion of all outstanding Shares, expressed as a percentage, and adjusted from time to time in accordance with this Agreement. The percentage referenced in the preceding sentence shall be determined by dividing (x) the total number of Shares held by such Shareholder as of such date by (y) the total number of Shares outstanding as of such date.

1.36    "**Permitted Transferee**" means (i) if the owner of the Shares to be Disposed of is a natural Person, any member of his or her Family, or a custodian, trustee or other fiduciary for the account of such Person or member of his or her Family, (ii) in the case of a Special Common Holder, any Affiliate or direct or indirect beneficiary of such Person; provided that such proposed transferee is not a Competitor of the Company, or (iii) in the case of a Healist Group Holder, to any Person that is not a Competitor of the Company.

1.37    "**Person**" shall mean an individual, firm, partnership, corporation, or other legal or business entity, howsoever characterized.

1.38    "**Put/Call Agreement**" shall mean that certain Put/Call Agreement, dated as of even date herewith, between the Company and the Blocker Entity.

1.39    "**Put Right**" has the meaning set forth in the Put/Call Agreement.

1.40    "**Series B Holders**" means the Shareholders who hold Series B Preferred Stock.

1.41    "**Shareholder**" and "**Shareholders**" shall mean the Shareholders as reflected in the introductory paragraph above, any Shareholders subsequently added to this Agreement pursuant to Section 2.1, and their legal representatives, permitted successors, and permitted assigns, provided, however, that for purposes of application of the terms and provisions of this Agreement.

1.42    "**Special Common Holders**" means each of Anna-Maria and Stephen Kellen Foundation, Inc., a Delaware corporation, Denise and Michael Kellen Foundation, Inc., a Delaware corporation, Marina Kellen French Foundation, a traditional trust settled under the laws of the State of New York, the Ellen-Maria Gorrissen Trust 1 U/A Dated 6/3/1993, a traditional trust settled under the laws of the State of New York, and The Ellen-Maria Gorrissen Trust 2 U/A Dated 6/3/1993, a traditional

4

4822-2229-6297

KW2_100516

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

trust settled under the laws of the State of New York, and each of their Permitted Transferees, for so long as each such Person holds shares of Common Stock in the Company.

1.43    "**Special Purchase Notice**" has the meaning set forth in <u>Section 3.4(c)</u>.

1.44    "**Special Purchase Right**" has the meaning set forth in <u>Section 3.4(a)</u>.

1.45    "**Triggered Shareholder**" has the meaning set forth in <u>Section 3.5(a)</u>.

1.46    "**Trigger Event**" means the occurrence of any of the following events with respect to a Shareholder:

(a)    The Person engages in Disabling Conduct;

(b)    Such Person does any of the following: (i) makes an assignment for the benefit of creditors; (ii) files a voluntary petition in bankruptcy; (iii) is adjudicated as bankrupt or insolvent; (iv) files a petition or answer seeking for the Shareholder any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or rule; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Shareholder in a bankruptcy, insolvency, reorganization or similar proceeding; or (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Shareholder or of all or any substantial part of the Shareholder property;

(c)    If (i) within 30 days after the commencement of any proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or (ii) within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of such Person's properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated;

(d)    If such Person is a natural person: (i) the Person's death; (ii) the entry of an order or judgment by a court of competent jurisdiction adjudicating the Person incompetent to manage the individual's Person or his or her estate;

(e)    If such Person is acting as a Shareholder by virtue of being a trustee of a trust, the termination of the trust but not merely the substitution of a new trustee;

(f)    If such Person is a general or limited partnership, the dissolution and commencement of winding up of the partnership; if such Person is a corporation, the filing of a certificate of dissolution or its equivalent for the corporation or revocation of its charter; if such Person is an estate, the distribution by the fiduciary of the estate's entire interest in the Company; or if such Person is another foreign or domestic limited liability company, the filing of articles of dissolution or termination or their equivalent for the foreign or domestic limited liability company; or

(g)    If such Person is any type of legal entity (other than a trust) that is, as of the date such Person first became a Shareholder of the Company, majority owned (directly or indirectly) by any individual, such individual ceases to own (directly or indirectly) at least a majority of such Shareholder.

1.47    "**Trigger Notice**" has the meaning set forth in <u>Section 3.5(a)</u>.

5

4822-2229-6297

KW2_100517

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

2. **Issuance of Shares.**

2.1    The Parties understand that the Shares have not been registered under the Act and have been issued in reliance in part upon the exemptions afforded under Regulation D or Section 4(a)(2) of the Act; nor have such Shares been registered or qualified under the securities laws of any state securities laws.

2.2    The Board shall be authorized to sell additional shares of Common Stock or Preferred Stock, provided that any new Shareholder executes and agrees to be bound by the terms of this Agreement by executing a counterpart to this Agreement.

Each certificate representing the Shares of Company shall bear on the face of the same the following legend:

"The sale or other transfer for consideration of the shares represented by this certificate or any interest therein is subject to the restrictions of a Shareholder Agreement effective as of _____ __, 2021, as the same may be amended or restated from time to time (the "**Shareholder Agreement**"). A copy of the Shareholder Agreement is available for inspection during normal business hours at the principal executive office of the Company. All the terms and provisions of the Shareholder Agreement are hereby incorporated by reference and made a part of this certificate."

3. **Dispositions.**

3.1    <u>All Dispositions Limited</u>.

(a)    No Shareholder shall pledge, encumber, hypothecate, or otherwise create a security interest in, any Shares (including rights to receive distributions with respect to such Shares), whether in order to secure any debt or obligation or otherwise, and whether voluntarily or involuntarily, unless such Disposition constitutes a Permitted Transfer (as provided in <u>Section 3.2</u>).

(b)    No Shareholder shall Dispose of all or any part (whether with or without consideration and whether voluntarily or involuntarily or by operation of law) of the Shares owned by it unless and until the transferee executes and delivers to the Company the counterpart of this Agreement, whereby such transferee shall become bound by the provisions of this Agreement in the same manner and to the same extent as the other Shareholders.

(c)    In addition, unless otherwise determined by the Board, no Disposition of Shares shall be permitted unless all of the following are satisfied:

(i)    The transferor and the transferee reimburse the Company for all costs that the Company incurs in connection with such Disposition;

(ii)    The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Shares transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns;

(iii)    The Shares which are the subject of the Disposition are registered under the Act, and any applicable state securities laws, or alternatively, counsel for the transferor furnishes an opinion in form and substance satisfactory to the Company that such Disposition is exempt from all

6

4822-2229-6297

KW2_100518

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

applicable registration requirements or that such Disposition will not violate any applicable securities laws; and

           (iv)     The transferor and the transferee agree to execute such documents and instruments necessary or appropriate in the discretion of the Board to confirm such Disposition.

Any Disposition in violation of this Section 3.1 shall be void ab initio and of no force or effect.

3.2     Permitted Transfers. The following Dispositions shall constitute "**Permitted Transfers**":

    (a)    The Disposition is to a Permitted Transferee;

    (b)    The Disposition is made with the prior written consent of the Board; or

    (c)    A Disposition may be effected pursuant to the exercise of the drag-along right set forth in Section 3.3, pursuant to the exercise of the tag-along right set forth in Section 3.6, or pursuant to a purchase upon any event specified in Section 3.5 (Dispositions upon Trigger Event) or Section 3.4 (Dispositions upon a divorce or legal separation).

3.3     Drag-Along Rights

    (a)    Notwithstanding any other provision set forth this Agreement to the contrary, but subject to Section 3.7, in the event that any merger, liquidation, dissolution, or sale of all or substantially all of the Company's Shares or assets (each such transaction an "**Exit Transaction**") is approved by the Board, the Board shall be entitled to cause each Shareholder to (i) if the Board determines that such vote is contractually or legally required, vote any and all Shares having the right to vote held by it, or as to which it has voting power, in favor of the consummation of the Exit Transaction, at any meeting of Shareholders of the Company at which such transactions are considered, or in any written consent of Shareholders of the Company relating thereto, (ii) if applicable, tender all Shares of the Company held by it, or as to which it has power of disposition, which are the subject of such proposed Exit Transaction in accordance with the terms of the proposed Exit Transaction, (iii) if applicable, waive any dissenters' rights, preemptive rights, or appraisal rights, as the case may be, (iv) subject to Section 3.7(c), taking steps necessary to permit the direct or indirect Disposition of shares of capital stock of Blocker Entity (or any successor equity security thereto) by the holders thereof, and (v) take all other actions reasonably required in order to effectuate fully the Exit Transaction.

    (b)    In connection with the pursuit and consummation of any Exit Transaction provided for above, each Shareholder that is a party to this Agreement (each a "**Drag-Along Shareholder**") hereby: (i) grants to each member of the Board an irrevocable proxy (which shall be and shall be deemed to be coupled with an interest) to vote (by actual vote or by written consent) the Shares held by such Drag-Along Shareholder or its successors and permitted assigns and transferees in favor of any Exit Transaction pursued in connection with this Section 3.3 in the event that such Drag-Along Shareholder or its successors and permitted assigns and transferees fail to consent in writing or vote for any such Exit Transaction; and (ii) agrees to promptly execute and deliver (without unreasonable condition or delay) any transaction agreement(s) and documentation (including, without limitation, member agreements, waivers and releases, and affiliate letters) deemed necessary, appropriate, or advisable by the Company or the Board in connection with the Exit Transaction. In the event that a Drag-Along Shareholder or its successors or permitted assigns and transferees fails to promptly execute and deliver any such transaction agreement(s) and documentation, or attempts to unreasonably condition or delay the execution or delivery thereof, each member of the Board (or its designee) shall be deemed to have been irrevocably appointed as an attorney-in-fact of such Drag-Along Shareholder (or the successor

7

KW2_100519

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

or permitted assignees or transferees thereof), with full power to execute and deliver any and all such transaction agreement(s) and documentation in the name and on behalf of such Drag-Along Shareholder (or the successor or permitted assignees or transferees thereof). In addition to any other rights and remedies available to them at law or in equity, the Board (and, when applicable pursuant to this <u>Section 3.3</u>, the Company) will be entitled to specifically enforce the terms of this Agreement with respect to any Exit Transaction.

(c)　　To the extent applicable, any transaction taken pursuant to this <u>Section 3.3</u> shall take into consideration the Liquidation Value of each party's Shares, in each instance as reasonably determined by the Board.

(d)　　To the extent applicable, any transaction taken pursuant to this <u>Section 3.3</u> shall be taken subject to the rights provided to the Special Common Holders in <u>Section 3.7</u>.

3.4　　<u>Marital Dissolution or Legal Separation</u>.

(a)　　<u>Grant</u>. The Company shall have the right (such right to be exercised by the Board) (the "**Special Purchase Right**"), exercisable at any time during the 45-day period following the Company's receipt of the required Dissolution Notice under <u>Section 3.4(b)</u>, to purchase from the Shareholder's spouse, in accordance with the provisions of <u>Section 3.4(c)</u>, any or all of the Shareholder's Shares which would otherwise be awarded to such spouse incident to the dissolution of marriage or legal separation in settlement of any community property or other marital property rights such spouse may have or obtain in the Shareholder's Shares. The Special Purchase Right shall not apply to any Shares retained by the Shareholder.

(b)　　<u>Notice of Decree or Agreement</u>. Each Shareholder shall promptly provide the Company with written notice (the "**Dissolution Notice**") of (i) the entry of any judicial decree or order resolving the property rights of the Shareholder and the Shareholder's spouse in connection with their marital dissolution or legal separation, or (ii) the execution of any contract or agreement relating to the distribution or division of such property rights. The Dissolution Notice shall be accompanied by a copy of the actual decree of dissolution or settlement agreement between Shareholder and the Shareholder's spouse, which provides for the award to the spouse of any Shares in settlement of any community property or other marital property rights such spouse may have in such Shares.

(c)　　<u>Exercise of Special Purchase Right</u>. The Special Purchase Right shall be exercisable by delivery of written notice (the "**Special Purchase Notice**") to the Shareholder and the Shareholder's spouse within 45 days after the Company's receipt of the Dissolution Notice. The Special Purchase Notice shall indicate the date the purchase is to be effected (such date to be not less than 10 days, nor more than 45 days, after the date of the Special Purchase Notice), and the amount that the Company proposes to pay for the Shares. If the Shareholder's spouse does not agree to the amount proposed to be paid by the Company, then the price to be paid shall be the Liquidation Value of such Shares. The purchase price shall be payable, at the option of the Company, (i) in all cash at closing, or (ii) twenty percent (20%) cash at closing and the remainder pursuant to a four (4)-year nonnegotiable promissory note bearing interest at the Default Interest Rate compounded annually on each anniversary of the note. The note shall be payable in monthly installments of principal and interest accrued to date, with payments as are necessary to fully amortize the note with equal payments of principal and interest over the four (4)-year term of the note. Interest shall be computed on the basis of a computational year of 360 days of equal 30-day months.

3.5　　<u>Trigger Event</u>.

4822-2229-6297

KW2_100520

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

(a)    Notification of Trigger Event. Within 60 days from the occurrence of a Trigger Event with respect to any Shareholder, the Person for whom a Trigger Event has occurred (for these purposes, the "**Triggered Shareholder**") (or the Triggered Shareholder's personal representative or other successor if applicable) shall provide the Company with written notice ("**Trigger Notice**") of the Trigger Event. Following the occurrence of a Trigger Event with respect to a Triggered Shareholder, the voting rights of such Triggered Shareholder shall be as set forth in Section 4.3.

(b)    Company's Option to Purchase. For the 90-day period (the "**Company's Option Period**") commencing on the first to occur of (i) the Company's receipt of the Trigger Notice or (ii) if no Trigger Notice is received, the Company first learns of the Trigger Event, the Company (as determined by the Board) shall have the option (the "**Company's Trigger-Related Purchase Option**") to purchase all, and not less than all, of the Triggered Shareholder's Shares. The Company's Trigger-Related Purchase Option shall be deemed exercised upon delivery of written notice (the "**Company's Notice of Trigger-Related Exercise**") to the Triggered Shareholder (or the Triggered Shareholder's personal representative or other successor if applicable) prior to the expiration of the Company's Option Period.

(c)    Purchase Consideration. The purchase price shall be payable, at the option of the Company, (i) in all cash at closing, or (ii) twenty percent (20%) cash at closing and the remainder pursuant to a four (4)-year nonnegotiable promissory note bearing interest at the Default Interest Rate compounded annually on each anniversary of the note. The note shall be payable in monthly installments of principal and interest accrued to date, with payments as are necessary to fully amortize the note with equal payments of principal and interest over the four (4)-year term of the note. Interest shall be computed on the basis of a computational year of 360 days of equal 30-day months. In connection with consummation of the purchase, the Triggered Shareholder shall deliver a duly executed assignment and such other documentation, as may be reasonably requested by any authorized officer of the Company to effect the transfer of the Shares, in form and substance reasonably satisfactory to such officer, free and clear of any Liens.

(d)    Purchase Price and Closing. The applicable notice of exercise shall indicate (i) the date the purchase is to be effected, provided such date is not less than 5 Business Days, nor more than 20 Business Days, after the date of the expiration of the applicable option period, provided, however, that if any regulatory approval or waiting period is required in connection with any such purchase, then the period specified above shall be extended by the number of days necessary to satisfy such regulatory requirement, and (ii) the amount which the Company proposes to pay for the Shares. If the Triggered Shareholder (or the Triggered Shareholder's personal representative or other successor if applicable) does not agree to the amount proposed to be paid:

(i)    If the purchase contemplated herein arises as a result of the Triggered Shareholder's engagement in Disabling Conduct, then the price to be paid for such Shares shall be fifty percent (50%) of the Liquidation Value of the Shares; and

(ii)    In all other instances, the price to be paid shall be equal to the Liquidation Value of the Shares, net of any amounts owed by the Triggered Shareholder to the Company.

3.6    Tag-Along Sale.

(a)    If a Founder desires to Dispose of all or a portion of its Shares other than to a Permitted Transferee (each, a "**Third-Party Purchaser**"), such Founder must first give written notice of such intent to the Special Common Holders, Healist Group Holders, and the Davis Financing Holders, which notice shall state the name of the Third-Party Purchaser, the price, and the general terms and conditions of such Disposition (the "**Transfer Notice**"). Each Healist Group Holder, Special Common

9

KW2_100521

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

Holder and Davis Financing Holder may elect to exercise its right to participate with the Founder in the proposed Disposition (the "**Tag-Along Sale**") on the same terms and conditions specified in the Transfer Notice (or on such other terms and conditions that are no more favorable to the proposed purchaser than the terms and conditions contained in the Transfer Notice).

(b)    Each Special Common Holder, Healist Group Holder, and Davis Financing Holder who desires to exercise this tag-along right must give the Founder a written notice prior to the expiration of fifteen (15) days following delivery of the Transfer Notice. If any Healist Group Holder, Special Common Holder, or Davis Financing Holder elects to participate in such Disposition (each such Person so electing to participate is a "**Tag-Along Shareholder**"), each Tag-Along Shareholder will be entitled to sell in the contemplated Disposition, at the same price and on the same terms, the number of Shares equal to the product of (i) the quotient determined by dividing (A) the Percentage Interest of the Tag-Along Shareholder by (B) the aggregate Percentage Interest of the Founder and all such Tag-Along Shareholders, *multiplied by* (ii) the number of Shares to be sold in the Tag-Along Sale.

For example, if the offer contemplated a sale of 20 Shares by the Founder, and if the Founder at such time owns 75% of all Shares and if the Tag-Along Shareholders own 10% of all Shares, the Tag-Along Shareholders would be entitled to sell 2.35 Shares ((10% ÷ 85%) x 20 Shares) and the Founder would be entitled to sell 17.65 Shares ((75% ÷ 85%) x 20 Shares).

(c)    The Founder will not Dispose of any of its Shares to the prospective transferee if the prospective Third-Party Purchaser declines to allow the participation of any Tag-Along Shareholder, provided that each Tag-Along Shareholder shall within the prescribed time cause to be discharged any and all encumbrances of, and security interests in, its Shares and provide written evidence of such discharges (other than encumbrances under this Agreement or the other organization documents of the Company).

(d)    If the closing of such Tag-Along Sale does not occur within ninety (90) days after the date of the Transfer Notice with respect thereto, or if the actual terms and conditions of the Tag-Along Sale are not substantially identical to those set forth in the Transfer Notice (or on such other terms and conditions that are no more favorable to the proposed purchaser than the terms and conditions contained in the Transfer Notice), the Tag-Along Shareholders shall be entitled to revoke their election to participate in such Tag-Along Sale, in which event any subsequent Disposition of Shares by such Founder shall once again become subject to the provisions of this Section 3.6. The exercise or non-exercise of the rights of a Special Common Holder, Healist Group Holder, or Davis Financing Holder hereunder to participate in one or more sales of Shares made by a Founder shall not adversely affect a Special Common Holder's, Healist Group Holder's, or Davis Financing Holder's right to participate in subsequent sales of Shares.

(e)    To the extent applicable, any transaction taken pursuant to this Section 3.6 shall be taken subject to the rights provided to the Healist Group Holders, Special Common Holders and Davis Financing Holders in Section 3.7.

3.7    Exit Transaction and Tag-Along Rights.

(a)    In the event that the Healist Group Holders, Special Common Holders or Davis Financing Holders are required to make any representations or indemnities in connection with an Exit Transaction or Tag-Along Sale, then (i) no Healist Group Holder, Special Common Holder or Davis Financing Holder shall be required to make any representations, warranties or indemnities in such Exit Transaction or Tag-Along Sale that are different than the representations, warranties and indemnities made by all other Shareholders in such Exit Transaction or Tag-Along Sale, and no Healist Group Holder,

10

4822-2229-6297

KW2_100522

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

Special Common Holder or Davis Financing Holder shall be required to make any representations or warranties other than those provided for in clause (iv) below; provided, however, that Blocker Entity shall be required to provide customary representations and warranties (including, but not limited to, with respect to the payment of taxes) relating to a blocker company in such Exit Transaction or Tag-Along Sale, (ii) no Healist Group Holder, Special Common Holder or Davis Financing Holder shall be liable for the inaccuracy of any representation or warranty, nor any indemnity associated therewith, made by any other Person in connection with an Exit Transaction or Tag-Along Sale, other than the Company, provided that any liability for breach of any representation, warranty, covenant or agreement related to the Company shall be allocated among each Shareholder transferring Shares in the Exit Transaction or Tag-Along Sale, as applicable, pro rata based on the consideration received by each Shareholder in the Exit Transaction, (iii) such representations, warranties and indemnities shall be several and not joint and each Healist Group Holder, Special Common Holder and Davis Financing Holder shall not be liable for more than the value of the consideration received by such Person for its Units in such Exit Transaction or Tag-Along Sale, as applicable, and (iv) all representations and indemnities made by a Healist Group Holder, Special Common Holder or Davis Financing Holder concerning such Shareholder's valid ownership of such Shareholder's Shares, free of all liens and other encumbrances (other than those arising under applicable securities laws and this Agreement), such Shareholder's authority, power and right to enter into and consummate such Exit Transaction or Tag-Along Sale, as applicable, without violating any other agreement or any applicable law and, if applicable, such Shareholder's qualification to acquire and hold any securities issued to such Shareholder in connection with such Exit Transaction or Tag-Along Sale (including any representations and indemnities customarily provided in connection with the acquisition of securities by an investor thereof) shall be the sole responsibility of such Shareholder and no other Shareholder shall be liable therefor.

(b)     None of the Healist Group Holders, Special Common Holders or Davis Financing Holders shall be required to enter into any non-competition or other restrictive covenant arrangement (other than with regards to confidentiality) in connection with any Exit Transaction or Tag-Along Sale.

(c)     Notwithstanding anything to the contrary contained herein, any Special Common Holder may elect to include in any Disposition pursuant to an Exit Transaction or a Tag-Along Sale a proportionate number of shares of capital stock of Blocker Entity in lieu of all or any portion of the Shares it would otherwise be entitled to Dispose of in connection with an Exit Transaction or a Tag-Along Sale hereunder, in each case on the same terms and conditions that such Shares would have been transferred (including the consideration payable therefor). The holders of capital stock of Blocker Entity are express third party beneficiaries of this Section 3.7 and shall be entitled to enforce this Section 3.7 as if they were a party to this Agreement.

4.      **Voting Provisions Relating to the Board.**

4.1     Board Size. Each Shareholder shall vote, or cause to be voted, at a regular or special meeting of shareholders (or by written consent) all Shares owned by such Shareholder (or as to which such Shareholder has voting power) to ensure that the size of the Board shall be set and remain at seven (7) directors, subject to Section 4.2(d) and Section 4.3.

4.2     Directors. During the term of this Agreement, in any election of the Company's directors, the Shareholders shall each vote at any annual or special meeting of shareholders (or by written consent) all Shares to elect:

(a)     For so long as Approach Marketing LLC (or any Permitted Transferee of Approach Marketing LLC) holds more than 50% of the shares of Common Stock held by Approach

11

4822-2229-6297

KW2_100523

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

Marketing LLC as Common Units as of the Fourth A&R Effective Date, one director appointed by Approach Marketing LLC. The initial director appointed by Approach Marketing LLC to the Board is Erick Dickens.

(b) For so long as Piedmont Brand Group, Inc. (or any Permitted Transferee of Piedmont Brand Group, Inc.) holds more than 50% of the shares of Common Stock held by Piedmont Brand Group, Inc. as Common Units as of the Fourth A&R Effective Date, one director appointed by Piedmont Brand Group, Inc. The initial director appointed by Piedmont Brand Group, Inc. to the Board is Doug Weekes.

(c) One director appointed by the Controlling Shareholders. The initial director appointed by the Controlling Shareholders is Todd Davis.

(d) From and after December 31, 2019 and ending on the earlier to occur of (1) a Change of Control, or (2) the payment of $6,400,000 in the aggregate to Elysium Asset Management, LLC pursuant to that certain Unit Purchase Agreement, dated as of February 4, 2020 by and among Elysium Asset Management, LLC, a California limited liability company, Integrated Strategic Support Services, LLC, a California limited liability company, and Kadenwood Biosciences LLC, a Delaware limited liability company, and certain other parties named therein, as the same has been amended or modified (the "**End Date**"), one director appointed by Elysium Asset Management, LLC, who shall be the then current Seller's Representative appointed. The initial director appointed by Elysium Asset Management, LLC to the Board is Glenn Russell. Immediately following the End Date, the number of persons on the Board shall automatically be reduced by one from the then-approved size of the Board, and the then serving director appointed by Elysium Asset Management, LLC shall automatically be removed from the Board.

(e) For so long as the Special Common Holders collectively hold 25% or more of the shares of Common Stock held by the Special Common Holders collectively as of the Effective Date, the Special Common Holders acting by Majority Approval of Special Common Holders shall appoint one director to the Board, provided that such director is approved by the remaining directors, whose approval shall not be unreasonably withheld, conditioned or delayed. The initial director appointed by the Special Common Holders to the Board is Jonathan Christodoro.

(f) For so long as Healist holds 25% or more of the Shares held by Healist as of the Effective Date, Healist shall appoint one director to the Board. The initial director appointed by Healist to the Board is Camillo Pane.

(g) One director appointed by the other directors on the Board by majority vote of such other directors. The initial director appointed by the other directors on the Board by majority vote of such other directors is Steve Garvey.

4.3    Board Size. The Board may, with majority approval of the Board, expand the size of the Board and in doing so appoint any director to fill such vacancy by majority approval of the Board. Promptly following any such expansion, or may reduce the size of the Board pursuant to Section 4.5 below. Following any such change in the size of the Board, the Board shall amend this Agreement to reflect such change in the size of the Board and any Person(s) entitled to appoint such additional director(s).

4.4    Removal. No director elected pursuant to Section 4.2(a) through 4.2(f) may be removed as a director unless (i) such removal is directed by the required affirmative vote of the Person(s) entitled to designate such director, with or without cause, or (ii) the Person(s) originally entitled to designate such

12

4822-2239-6297

KW2_100524

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

director is/are no longer entitled to designate such director, or (iii) the other directors on the Board, acting by majority approval of such other directors (not counting the vote of the director to be removed), votes to remove such director for Disabling Conduct.

4.5     Vacancy. Any vacancy on the Board created by the resignation, removal, incapacity or death of any director elected pursuant to Section 4.2 shall be filled in the same manner as set forth in Section 4.2, provided that any vacancy caused by the removal of a director for Disabling Conduct or because the Person(s) originally entitled to designate such director is/are no longer entitled to designate such director, shall be filled by the remaining directors by majority vote of such remaining directors, or, the Board may reduce the number of directors serving on the Board (and cause this Agreement to be amended to reflect such change in the size of the Board), provided, however, that (a) if the director appointed by the Special Common Holders is so removed, the Special Common Holders will appoint a new person to fill such vacancy, provided, further, that such director is approved by the remaining directors, whose approval shall not be unreasonably withheld, conditioned or delayed, and (b) if the director appointed by Healist is so removed, Healist will appoint a new person to fill such vacancy.

4.6     Triggered Shareholder Voting Rights.    Following a Trigger Event, the Triggered Shareholder shall vote or cause to be voted, at any regular or special meeting of shareholders (or by written consent), all Shares owned by such Triggered Shareholder solely as directed by the Board, and such Triggered Shareholder shall no longer be entitled to vote such Shares except in accordance with the Board's directives.

The voting provisions of this Section 4 are coupled with an interest and are irrevocable during the term of this Agreement.

5.     **Special Voting Rights.**

5.1     For so long as the Special Common Holders (i) in the aggregate, hold at least 37.5% of the shares of Common Stock held by such Special Common Holders in the aggregate as of the Effective Date (as may be equitably adjusted as necessary from time to time to account for redemptions or repurchases, other than pursuant to the Put Right, stock splits, stock dividends, combinations, and other similar events), and (ii) have received less than $20,000,000 in the aggregate from the Company pursuant to the Put Right exercised pursuant to the Put/Call Agreement, including amounts paid by offset pursuant to the Put/Call Agreement, the Board shall not take any of the following actions or enter into any of the following transactions without the prior written consent of the Majority Approval of Special Common Holders, such consent not to be unreasonably withheld:

(a)     Incur any indebtedness, other than trade debts in the ordinary course of business, without first giving the Special Common Holders a right of first offer with respect to any proposed incurrence of indebtedness pursuant to which the Special Common Holders, acting collectively, may propose an alternative offer within ten (10) days after receiving notice from the Company of such proposed indebtedness, which the Board will consider in good faith;

(b)     Amend the Certificate of Incorporation, this Agreement, the Put/Call Agreement, or the Company's bylaws in a manner that adversely affects the Special Common Holders in a disproportionate manner as compared to other holders of Common Stock, provided, for the avoidance of doubt, changes to the Certificate of Incorporation or this Agreement to reflect rights, preferences, and privileges granted to a holder or holders of a new class or series of capital stock may be made solely with the approval required by Delaware General Corporation Law; or

13

4822-2229-6297

KW2_100525

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

(c)     Encumber, grant any lien on, sell or otherwise transfer any equity interests or assets of EcoGen Biosciences, LLC, other than sales of inventory in the ordinary course of business.

5.2     The Board shall not create, or authorize the creation of, any capital stock unless the same ranks junior to the Series B Preferred Stock with respect to its rights, preferences and privileges without the Majority Approval of Series B Holders, such consent not to be unreasonably withheld, *provided, however*, that nothing herein shall prohibit the Board from authorizing and selling additional shares of Series B Preferred Stock up to the maximum amount of Series B Preferred Stock authorized in the Certificate of Incorporation as of the Effective Date.

5.3     Notwithstanding anything herein to the contrary, if the Board authorizes and sells additional shares of Series B Preferred Stock subsequent to the Effective Date ("**Subsequent Issuance**"), the Board will promptly provide the Healist Group Holders with written notice thereof, together with a copy of all documentation relating to such Subsequent Issuance and, upon written request of any Healist Group Holder, any additional information related to such Subsequent Issuance as may be reasonably requested by such Healist Group Holder. In the event any Healist Group Holder determines that the terms of the Subsequent Issuance are preferable to the terms of the Series B Preferred Stock issued to such Healist Group Holder, such Healist Group Holder will notify the Company in writing. Promptly after receipt of such written notice from such Healist Group Holder, the Board shall amend this Agreement to provide identical terms to those offered in the Subsequent Issuance. Notwithstanding the foregoing, this Section 5.3 shall not apply to (a) the issuance of Series B Preferred Stock to the Davis Financing Holders, or (b) the issuance of Series B Preferred Stock to any of the following existing investors of the Company who have current contractual rights to acquire Series B Preferred Stock at a discounted rate: (1) Discovery Communications, LLC and Sinclair Broadcast Group, Inc. each pursuant to their respective Simple Agreements for Future Equity, (2) Steve & Dayna McGrady, Truist Investment Services Inc ROTH IRA FBO Larry Milton, Arcadian New Venture Fund, LP, and The Armstrong Family Trust u/t/d 11/29/88, each pursuant to their respective Convertible Promissory Notes with the Company in the total aggregate principal amount of $1,000,000, (3) those investors who held Series AA Preferred Units prior to the Company's Conversion, and (4) Anna-Maria and Stephen Kellen Foundation, Inc. pursuant to its Convertible Promissory Note in the principal amount of $7,000,000.

6.     **Preemptive Right.**

6.1     The Company hereby grants to each Healist Group Holder and Special Common Holder a preemptive right to purchase its proportionate share, based on such Person's Percentage Interest, of any issuance of Shares or other equity securities or rights with respect to equity securities of the Company, including securities convertible into or exchangeable for equity securities (collectively, "**Securities**"), in which any Founder participates (each, a "**Preemptive Right Issuance**"), subject to the terms and conditions set forth below.

6.2     If the Board intends to issue and sell additional Securities in any Preemptive Right Issuance, the Company shall give each Healist Group Holder and Special Common Holder written notice of such intention, describing the general terms and conditions upon which the Company proposes to effect such issuance, including the rights of such Securities, the purchase price for such additional Securities, and the closing date for the sale and issuance of such Securities. Each Healist Group Holder and Special Common Holder shall have fifteen (15) days from the date of any such notice to agree to purchase all or part of its proportionate share of such Securities, based on such Person's Percentage Interest, for the price and upon the general terms and conditions specified in the Company's notice by giving written notice to the Company stating the quantity of Securities to be so purchased; provided, that, each such Person's Percentage Interest for purposes of this Section 6 shall be determined without giving effect to any Options issued to any of the Founders following the Fourth A&R Effective Date.

14

4822-2229-6297

KW2_100526

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

6.3     If any Healist Group Holder or Special Common Holders fail to exercise the foregoing preemptive right with respect to any Securities to be issued in a Preemptive Right Issuance within such initial fifteen (15)-day period (with any non-response constituting a deemed failure to exercise), the Company may within ninety (90) days thereafter sell any or all of such Securities not agreed to be purchased by the Healist Group Holders or Special Common Holders, at a price and upon general terms no more favorable to the purchasers thereof than specified in the notice given to each Healist Group Holder and Special Common Holder pursuant to Section 6.2. In the event the Company has not sold such Securities within such ninety (90)-day period, the Company shall not thereafter issue or sell any Securities in a Preemptive Right Issuance without again first offering such Securities to the Healist Group Holders and Special Common Holders in the manner provided above.

6.4     The preemptive rights under this Section 6 shall not apply to or be triggered by (i) the issuance of Options, or (ii) any subdivision of Shares (by a split of Shares, Share issuances, combinations, and other similar events or otherwise) or other Securities, payment of distributions or any similar recapitalization; provided, that, any such Healist Group Holder's or Special Common Holder's Percentage Interest for purposes of this Section 6 shall be determined without giving effect to any Options issued to any of the Founders following the Fourth A&R Effective Date.

7.     **Confidentiality**.

(a)     Except as provided in Section 7(b), at all times while a Person owns Shares, and at all times thereafter, each such Person will (A) keep confidential and not divulge, furnish or make accessible to any Person any Confidential Information, and (B) use the Confidential Information solely for purposes of performing its duties and obligations to the Company or under this Agreement and not for such Person's own benefit or the benefit of any other Person.

(b)     Each such Person shall be permitted to disclose Confidential Information to the extent, but only to the extent, (i) the Company provides its express prior written consent to such disclosure; (ii) such disclosure is to such Person's legal counsel, auditors, service providers or other consultants or advisors engaged by such Person with respect to the Company, subject to the receiving party's agreement to be subject to confidentiality restrictions no less stringent than those set forth in this Agreement; (iii) such disclosure is to any existing or prospective Affiliate, partner, member, stockholder, or wholly owned subsidiary of such Person in the ordinary course of business, subject to the receiving party's agreement to be subject to confidentiality restrictions no less stringent than those set forth in this Agreement, or (iv) required by law, administrative proceeding or judicial process; *provided,* that prior to making any disclosure of Confidential Information required by law, administrative proceeding or judicial process (whether pursuant to a deposition, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand, or other similar process), such Person must notify the Company of such Person's intent to make such disclosure, so that the Company may seek a protective order or other appropriate remedy and may participate with such Person in determining the amount and type of Confidential Information, if any, which must be disclosed in order to comply with applicable law.

(c)     Upon request by the Board at any time, each such Person shall return to the Company, or confirm in writing the destruction of, any Confidential Information which is in tangible form and which is then in such Person's possession.

(d)     As used herein, "**Confidential Information**" means all information concerning or related to the business, operations, financial condition or prospects of the Company (whether prepared by Company, its advisors or otherwise, and regardless of the form in which such information appears and whether or not such information has been reduced to a tangible form), and shall specifically include (without limitation):  (i) all information regarding the shareholders, officers, directors, employees, equity

15

4822-2229-6297

KW2_100527

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

holders, customers, suppliers, distributors, sales representatives and licensees of the Company, in each case whether past, present or prospective; (ii) all product ideas, software, inventions, discoveries, trade secrets, processes, techniques, methods, formulae, ideas and know-how of the Company; (iii) all financial statements, audit reports, budgets and business plans or forecasts of the Company; and (iv) all analyses, compilations, forecasts, data studies, notes, translations, memoranda, or other documents or materials containing, based on, generated or derived from, in whole or in part, any Confidential Information. The term "**Confidential Information**" does not include information that (i) is or becomes generally available to the public *other than* as a result of an unauthorized disclosure by a Shareholder (or former Shareholder bound by these provisions); or (ii) becomes available to such Person on a non-confidential basis from a source other than the Company, another Shareholder, director, or any of the Company's representatives; *provided,* that such source is not bound by a confidentiality agreement with, or other contractual, legal, or fiduciary obligation of confidentiality to, the Company with respect to such information.

(c)    Nothing in this Agreement prohibits or limits any Shareholder (or a Shareholder's attorney) from initiating communications directly with, responding to any inquiry from, volunteering information to, or providing testimony before, the Securities and Exchange Commission, the Department of Justice, or any other self-regulatory Company, governmental, law enforcement, or regulatory authority, regarding this Agreement and its underlying facts and circumstances, or any reporting of, investigation into, or proceeding regarding suspected violations of law, and Shareholder is not required to advise or seek permission from the Company before engaging in any such activity. In connection with any such activity, Shareholder must inform such authority of the confidential nature of any confidential information that Shareholder provides, provided, further, that Shareholder is not permitted to reveal any information that is protected by the attorney-client privilege or attorney-work product protection or any other privilege belonging to the Company. Furthermore, nothing contained in this Agreement is intended to prohibit or restrict Shareholder in any way from making any disclosure of information required by law. Additionally, under the Defend Trade Secrets Act (specifically, 18 USC §1833), Shareholder cannot be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and (ii) solely for the purpose of reporting or investigating a suspected violation of law. Shareholder may not be held so liable for disclosures made in a complaint or other document filed in a lawsuit or other proceeding, if that filing is made under seal.

8.    **Information Rights.**

8.1    <u>Books and Records</u>. At the Company's expense, the Board shall maintain or cause to be maintained the following records at the Company's known place of business:

(a)    A list of the full name and last known business, residence, or mailing address of each Shareholder, both past and present and the current directors;

(b)    A copy of the Certificate of Incorporation for the Company, and all amendments thereto;

(c)    A copy of the Company's currently effective bylaws and all amendments thereto;

(d)    Copies of the Company's Federal, state, and local income tax returns and reports for the six (6) most recent years;

(e)    Copies of financial statements of the Company, if any, for the six (6) most recent years; and

4822-2229-6297

KW2_100528

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

(f)    A copy of the Company's stock ledger.

Upon the written request of any Shareholder, such Shareholder or its designated representative shall have the right, at any reasonable time, to have access to and may inspect and copy the contents of the books or records required to be maintained by the Company pursuant to Delaware General Corporation Law, *provided*, however, that notwithstanding anything to the contrary in this Agreement, (i) the Board shall have the right to keep confidential from any Shareholder, for such period of time as the Board deems reasonable, any information which the Board reasonably believes to be in the nature of trade secrets or other information the disclosure of which the Board in good faith believes is not in the best interest of the Company or could damage the Company or its business or which the Company is required by law or by agreement with a third party to keep confidential, to the maximum extent permitted by Delaware General Corporation Law, and (ii) Special Common Holders shall have no rights to access the information and records of the Company unless the Board otherwise determines, to the maximum extent permitted by Delaware General Corporation Law, except to the extent expressly provided in Section 8.2. The cost of such inspection and copying shall be borne by the requesting Shareholder.

8.2    Reports. The Company shall deliver or provide to (a) the Healist Group Holders and (b) the Special Common Holders for so long as the Special Common Holders (i) in the aggregate, own at least 25% of the shares of Common Stock held by such Special Common Holders in the aggregate as of the Effective Date (as may be equitably adjusted as necessary from time to time to account for redemptions or repurchases other than pursuant to the Put Right, distributions, stock splits, stock issuances, combinations, and other similar events), and (ii) have received less than $30,000,000 in the aggregate from the Company pursuant to the Put Rights exercised pursuant to Put/Call Agreement, including amounts paid by offset pursuant to the Put/Call Agreement, the following:

(a)    Within ninety (90) days after the end of the Fiscal Year, unaudited annual financial statements of the Company, including a balance sheet, statements of operations and retained earnings, and statement of cash flows, prepared in accordance with GAAP;

(b)    Within thirty (30) days after the end of each fiscal month, unaudited monthly financial statements of the Company, including a balance sheet, statements of operations and retained earnings, and statement of cash flows, prepared in accordance with GAAP; and

(c)    Access to the books and records of the Company required to be maintained by the Company pursuant to Section 8.1, upon reasonable request by any Healist Group Holder or Special Common Holder.

8.3    Inspection Rights. For so long as the Special Common Holders (a) in the aggregate, own at least 25% of the shares of Common Stock held by such Special Common Holders in the aggregate as of the Effective Date (as may be equitably adjusted as necessary from time to time to account for redemptions or repurchases other than pursuant to the exercise of the Put Right under the Put/Call Agreement, distributions, stock splits, stock issuances, combinations, and other similar events), and (b) have received less than $30,000,000 in the aggregate from the Company pursuant to the Put Rights exercised pursuant to the Put/Call Agreement, including amounts paid by offset pursuant to the Put/Call Agreement, the Company shall permit the Special Common Holders and their representatives to visit and reasonably inspect any of the Company's facilities at any time and from time to time, during normal business hours and upon reasonable advance notice, at each such Special Common Holder's sole expense, and to have access to senior management of the Company and its subsidiaries.

17

4822-2229-6297

KW2_100529

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C   ID #:202

9.    **Termination of Agreement**

This Agreement shall terminate on the earliest of:

9.1    <u>Vote</u>. The vote of (a) the Controlling Shareholders, (b) the Majority Approval of Series B Holders, and (c) for so long as the Special Common Holders (i) in the aggregate, hold at least 37.5% of the shares of Common Stock held by such Special Common Holders in the aggregate as of the Effective Date (as may be equitably adjusted as necessary from time to time to account for redemptions or repurchases, other than pursuant to the Put Right, stock splits, stock dividends, combinations, and other similar events), and (ii) have received less than $20,000,000 in the aggregate from the Company pursuant to the Put Right exercised pursuant to the Put/Call Agreement, including amounts paid by offset pursuant to the Put/Call Agreement, the vote of the Majority Approval of Special Common Holders;

9.2    <u>Action by Debtor</u>. The Company's dissolution, filing of a petition in bankruptcy under Chapter 7 of the Bankruptcy Code, or insolvency of the Company;

9.3    <u>IPO</u>. Upon the closing of the sale of shares of Common Stock to the public in a firm-commitment underwritten public offering pursuant to an effective registration statement under the Act, resulting in at least $100 million of gross proceeds to the Company and in connection with such offering the Common Stock is listed for trading on the Nasdaq Stock Market's National Market, the New York Stock Exchange or another exchange or marketplace approved the Board; or

9.4    <u>One Shareholder</u>. At such time as only one Shareholder remains, the Shares of all others having been Disposed of or repurchased.

10.    **After-Acquired Shares.**    Shares acquired subsequent to the execution of this Agreement by a Shareholder shall be subject to the provisions of this Agreement to the same extent, and in the same manner, as Shares owned by a Shareholder on the date hereof.

11.    **General Provisions**

11.1    <u>Acknowledgement Concerning Counsel</u>.    Each of the Shareholders and the Company acknowledges and understands that this Agreement was prepared by Snell & Wilmer L.L.P., the attorney for the Company, and that Snell & Wilmer L.L.P. does not represent any of the Shareholders with respect to this Agreement.    Each other Party acknowledges that, in executing this Agreement, such Person has had the opportunity to seek the advice of independent legal counsel, and such Person has read and understood all of the terms and provisions of this Agreement. Snell & Wilmer L.L.P. is hereby expressly made a third party beneficiary of this Agreement for purposes of this <u>Section 11.1</u>.

11.2    <u>Agreement to Perform Necessary Acts</u>. Each Party to this Agreement agrees to perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

11.3    <u>Attorneys' Fees and Costs</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing Party shall be entitled to reasonable attorneys' fees, costs, and necessary disbursements in addition to any other relief to which he, she, or it may be entitled.

11.4    <u>Entire Agreement; Amendments</u>.

(a)    This Agreement (including the Exhibits attached hereto, which is hereby incorporated by reference and made apart hereof), along with any subscription agreement between

KW2_100530

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

Company and any Shareholder, constitutes the entire and final agreement among the Parties with respect to the subject matter hereof, and supersedes and replaces all prior agreements, understandings, commitments, communications and representations made among the Parties, whether written or oral, with respect to the subject matter hereof. Subject to Section 11.4(b), the provisions of this Agreement may be waived, altered, amended, or repealed, in whole or in part, only on the written consent of the Board and those Shareholders holding at least a majority of the Percentage Interests of the Company (except that the Board may amend Exhibit A following any new issuance, purchase, or Disposition of the Company's capital stock, and the Board may amend the Agreement pursuant to Section 4.3 and Section 5.3), provided, however, that any amendment which disproportionately and adversely impacts any of the rights, privileges, or preferences of any Shareholder (when compared to other Shareholders holding the same class or series of shares) granted pursuant to this Agreement shall require the consent of such Shareholder.

(b)    For so long as the Special Common Holders (i) in the aggregate, own at least 37.5% of the Common Stock held by such Special Common Holders in the aggregate as of the Effective Date (as may be equitably adjusted as necessary from time to time to account for redemptions or repurchases other than pursuant to the Put Right, distributions, Share splits, Share issuances, combinations, and other similar events), and (ii) have received less than $20,000,000 in the aggregate from the Company pursuant to the Put Rights exercised pursuant to the Put/Call Agreement, including amounts paid by offset pursuant to the Put/Call Agreement, the Company shall not amend this Agreement in a manner that adversely affects the Special Common Holders in a disproportionate manner as compared to other Shareholders without the prior written consent of the Majority Approval of Special Common Holders.

(c)    The Company shall not amend this Agreement in a manner that adversely affects the Series B Holders in a disproportionate manner as compared to other Shareholders without the Majority Approval of Series B Holders.

(d)    The rights of the Healist Group Holders under Section 4.2(f), Section 5.2, Section 5.3 shall not be waived, and the Company shall not amend Section 4.2(f), Section 5.2, Section 5.3 or otherwise amend this Agreement in a manner that adversely affects the Healist Group Holders in a disproportionate manner as compared to other Shareholders, in each case without the Majority Approval of Healist Group Holders.

(e)    Each Shareholder hereby makes, constitutes, and appoints the President and CEO of the Company, and each successor President and CEO of the Company, with full power of substitution and re-substitution, the Shareholder's true and lawful attorney in fact for the Shareholder and in the Shareholder's name, place and stead and for the Shareholder's use and benefit, to sign, execute, certify, acknowledge, swear to, file, and record any and all consents, agreements, certificates, instruments, and other documents that the President and CEO of the Company may deem necessary, desirable, or appropriate to reflect any amendment or supplement of this Agreement otherwise authorized hereby. Each Shareholder further authorizes such attorney in fact to take any further action that such attorney in fact shall consider necessary or advisable in connection with the foregoing, hereby giving each such attorney in fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in connection with the foregoing as fully as the President and CEO of the Company might or could do personally, and hereby ratifying and confirming all that any such attorney in fact shall lawfully do or cause to be done by virtue thereof or hereof.

(f)    The power of attorney granted pursuant to this Section 11.4 (A) is a special power of attorney coupled with an interest and is irrevocable; (B) may be exercised by any such attorney in fact by listing the Shareholders executing any consent, agreement, certificate, instrument or other

19

4822-2229-6297

KW2_100531

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

document with the single signature of any such attorney in fact acting as attorney in fact for such Shareholders or in a manner similar thereto, (C) may be delegated by any such attorney in-fact to any other executive officer of the Company; and (D) shall survive the death, disability, legal incapacity, bankruptcy, insolvency, dissolution, or cessation of existence of a Shareholder and shall survive the delivery of an assignment by a Shareholder of the whole or a portion of its interest in the Company.

11.5    Successors, Assigns, and Transferees. This Agreement shall be binding on, and shall inure to the benefit of, the Parties to it and their respective heirs, legal representative, successors, and assigns. Each transferee or any subsequent transferee of Shares of the Company, or any interest in such Shares, shall, unless this Agreement expressly provides otherwise, hold such Shares or interest in the Shares subject to all of the provisions of this Agreement and shall make no further Dispositions except as provided in this Agreement.

11.6    Validity of Agreement. It is intended that each paragraph of this Agreement shall be viewed as separate and divisible. In the event that any paragraph shall be held to be invalid, the remaining paragraphs shall continue to be in full force and effect.

11.7    Notices. Notices permitted or required under this Agreement shall be in writing and shall be given to the address set forth in the books and records of the Company by personal delivery (in which case notice shall be deemed given upon such personal delivery), by certified or registered mail (in which case notice shall be deemed given on the third business day after deposit with adequate postage), with next-business-day instruction by a recognized courier service (in which case notice shall be deemed given on the next business day), by electronic mail to the email address indicated for such Party in the books and records of the Company (in which case notice shall be deemed given on the same date as the transmission of such email, unless such transmission occurs after regular business hours, in which case notice shall be deemed given on the next business day).

11.8    Governing Law. This Agreement shall be construed in accordance with, and governed by, the laws of Delaware.

11.9    Arbitration.  Upon the occurrence of any dispute or disagreement between the parties hereto arising out of or in connection with any term or provision of this Agreement, the subject matter hereof, or the interpretation or enforcement hereof (in each case, a "**Dispute**"), the parties shall submit the Dispute to final and binding arbitration in Orange County, California, administered by JAMS, or its successor, in accordance with the rules and procedures of JAMS then in effect. The parties agree that any and all Disputes that are submitted to arbitration in accordance with this Agreement shall be decided by one (1) neutral arbitrator who is a retired judge or attorney who is experienced in complex commercial transactions. If the parties are unable to agree on an arbitrator, JAMS shall designate the arbitrator. The parties will cooperate with JAMS and with one another in selecting the arbitrator and in scheduling the arbitration proceedings in accordance with applicable JAMS procedures.  The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures (https://www.jamsadr.com/rules-comprehensive-arbitration/).  Any party may commence the arbitration process called for in this Agreement by filing a written demand for arbitration with JAMS, with a copy to the other party.  Each of the Shareholders irrevocably and unconditionally consents to the exclusive jurisdiction of JAMS to any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, and further consents to the jurisdiction of any state court of the State of California or any federal court located in the State of California for the purpose of enforcing the arbitration provisions of this Section 11.9 or hearing any other dispute, claim, or controversy under this Agreement (including enforcement of any award of specific performance and any

20

4822-2229-6297

KW2_100532

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

claim for any provisional remedy, temporary, preliminary or permanent injunctive relief or other equitable relief).

11.10   Injunctive Relief.   The Parties acknowledge that a breach or threatened breach of the provisions of Section 7 by any of the Parties may cause the non-breaching Party to suffer irreparable harm and injury such that no remedy at law will adequately compensate the non-breaching Party. Thus, the non-breaching Party shall have the right to seek injunctive relief with respect to such breach or threatened breach, without the necessity of showing any particular injury or damage, and without the posting of any bond or other security, in any state court or federal court located in the State of California or pursuant to arbitration set forth in Section 11.9.

11.11   No Exemplary Damages.   To the fullest extent permitted by law, no party to this Agreement shall be liable to any other party for any claims, demands or suits for any consequential, incidental, special, exemplary, punitive, indirect or multiple damages connected with or resulting from any breach of, or obligation under, this Agreement, or any actions undertaken in connection with or related hereto or thereto.

11.12   Captions and Pronouns.   The captions of sections in this Agreement are for the convenience of the reader only and are not intended to be part of this Agreement. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular, or plural as the identification of the person, firm, corporation, or other entity referred to may require.

11.13   Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile transmission or .PDF delivered via email will constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.

11.14   Representations and Warranties.   By execution hereof, each Shareholder represents and covenants as follows:

(a)   This Agreement has been duly executed and delivered by such Person and constitutes the legal, valid, and binding obligation of such Person enforceable in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy and other laws of general application relating to creditors' rights or general principles of equity;

(b)   Each Person entering into this Agreement has had the opportunity to review this Agreement and the subject matter hereof with such Person's own attorneys and financial and tax advisers and it has not received any legal, financial or other tax advice from any other Shareholder, director, or their respective Affiliates;

(c)   No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental entity remains to be obtained or made in connection with the execution and delivery of this Agreement by such Person or the consummation by such Person of the transactions contemplated hereby;

(d)   There is no litigation, claim, proceeding or investigation of any nature pending or, to such Person's knowledge, threatened against or affecting such Person or any of its Affiliates that would materially interfere with its ability to fully perform its obligations under this Agreement;

21

4822-2229-6297

KW2_100533

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

      (e)     As of the Effective Date, such Person has no reason to believe that it will not be able to satisfy on a timely basis any of its obligations contained in this Agreement; and

      (f)     This Agreement does not violate, conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default or an event of default under any other agreement of which such Person is a party.

[The remainder of this page has been intentionally left blank.]

22

4822-2229-6297

KW2_100534

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the date set forth above.

Kadenwood, Inc.

By: _____

Name: __Erick Pickens_____

Its: __CEO_____

[Signatures continue next page.]

4822-2229-6297

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the date set forth above.

**SHAREHOLDER:**

**<u>If an individual</u>:**

By: _____

Print Name: _____

Date: _____ __, 20__

**<u>If an entity</u>:**

Name of Entity: _____

By: _____

Print Name: _____

Title: _____

Date: _____

4822-2229-6297

**KW2_100536**

DocuSign Envelope ID: AF3A223F-BAC7-48A5-BA60-C30368FB151C

**EXHIBIT A**

**SHAREHOLDERS**

See attached.

EXHIBIT A

4822-2229-6297

KW2_100537