# EXHIBIT B

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

# KADENWOOD, INC.
## A DELAWARE CORPORATION

### SUBSCRIPTION DOCUMENTS

### MARCH 31, 2022

Kadenwood, Inc.
450 Newport Center Drive, Suite 550
Newport Beach, CA 92660
Attn: Erick Dickens
Email: erick@kadenwoodbrands.com

\4862-6139-5226

**EXHIBIT**

1042

Weekes

PENGAD 800-631-6989

KW2_103085

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

## DIRECTIONS FOR THE COMPLETION
## OF THE SUBSCRIPTION DOCUMENTS

Prospective investors must complete all of the subscription documents (the "Subscription Documents"), contained in this package in the manner described below. For purposes of these Subscription Documents, the "Investor" is the person or entity for whose account the Shares are being purchased. Another person or entity with investment authority may execute the Subscription Documents on behalf of the Investor, but should indicate the capacity in which it is doing so and the name of the Investor.

1. Subscription Agreement:

   (a) Fill in amount of the Capital Contribution on the signature page.

   (b) Date, print the name of the Investor, and sign (and print name, capacity and title, if applicable) on the signature page.

2. Investor Data Sheet:

   Please complete the Investor Data Sheet.

3. Investor Questionnaire:

   (a) Print the name of the Investor and provide other requested information in the space provided in Section A.

   (b) Each Investor should check the appropriate box in Section B corresponding to the Investor's U.S. or non-U.S. status and related tax information.

   (c) Each Investor should check the box or boxes in Section C that are next to the category or categories under which the Investor qualifies as an accredited investor.

   (d) Print the name of the Investor and sign (and print name, capacity and title, if applicable) on the signature page.

4. Tax Form:

   (a) Each U.S. Investor should fill in, sign and date and deliver to the Company a Form W-9 in accordance with the instructions to the Form.

   (b) Each Non-U.S. Investor should fill in, sign and date and deliver to the Company the applicable Form W-8 in accordance with the instructions to such Form.

5. Joinder Agreement to the Shareholder Agreement:

   Sign a Joinder Agreement to the Shareholder Agreement as set forth in Appendix B.

6. Delivery of Subscription Documents:

   Subscription Documents, consisting of the following completed documents:

   (a) one signed copy of the Subscription Agreement;

\4862-6139-5226

KW2_103086

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

(b)    the Investor Data Sheet;

(c)    a signed Investor Questionnaire;

(d)    a signed Form W-8 or W-9, as applicable; and

(e)    a signed Joinder Agreement to the Shareholder Agreement

should be delivered as soon as possible to Kadenwood, Inc. at the following address or email:

> Kadenwood, Inc.
> 450 Newport Center Drive, Suite 550
> Newport Beach, CA 92660
> Attn: Erick Dickens
> Email: erick@kadenwoodbrands.com

Inquiries regarding subscription procedures (including, if the Investor Questionnaire indicates that any Investor's response to a question requires further information) should be directed to the above-named contact.

If the Investor's subscription is accepted by the Company (in whole or in part), a fully executed set of the Subscription Documents will be returned to the Investor.

\4862-6139-5226

KW2_103087

THIS OFFERING IS RESTRICTED TO ACCREDITED INVESTORS WITHIN THE MEANING OF RULE 501(a) UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). THIS OFFERING IS MADE PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 4(a)(2) OF THE ACT AND RULE 506 OF REGULATION D PROMULGATED THEREUNDER, AS WELL AS SIMILAR EXEMPTIONS UNDER APPLICABLE STATE SECURITIES LAWS. THE SHARES HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE ACTS AND MAY NOT BE OFFERED OR SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THE SHARES ARE REGISTERED UNDER SUCH ACTS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THE SHARES IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE ACT AND APPLICABLE STATE SECURITIES LAWS.

THE SHARES MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO A "U.S. PERSON," WITHIN THE MEANING OF REGULATION S UNDER THE ACT, IN THE ABSENCE OF AN EFFECTIVE REGISTRATION UNDER THE ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.  ADDITIONAL RESTRICTIONS ON THE TRANSFER OF SHARES ARE CONTAINED IN THE COMPANY'S SHAREHOLDER AGREEMENT. BASED UPON THE FOREGOING, EACH ACQUIRER OF A UNIT MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF INVESTMENT THEREIN FOR AN INDEFINITE PERIOD OF TIME.

THIS SUBSCRIPTION AGREEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITY OTHER THAN THE SHARES OFFERED HEREBY, NOR DOES IT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY SUCH SECURITIES BY ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.

THE SHARES OFFERED PURSUANT TO THIS SUBSCRIPTION AGREEMENT ARE SUBJECT TO SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY. IN ADDITION, THE SHARES ARE SUBJECT TO THE RESTRICTIONS CONTAINED IN THE COMPANY'S SHAREHOLDER AGREEMENT.

## SUBSCRIPTION AGREEMENT

Kadenwood, Inc.
450 Newport Center Drive, Suite 550
Newport Beach, CA 92660
Attention: Erick Dickens

Ladies and Gentlemen:

1.      Subscription. The undersigned (the "Investor"), subscribes for and agrees to purchase Series B Preferred Stock (the "Shares") in Kadenwood, Inc. (the "Company") in consideration of the payment by Investor to the Company of the amount set forth on the signature page hereof by cash or wire transfer of immediately available funds, or such other consideration as set forth on the signature page hereof, which is payable in its entirety at the time Investor submits this Subscription Agreement (this "Agreement")

\4862-6139-5226

KW2_103088

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

to the Company. The Investor acknowledges that this subscription is irrevocable on the part of the Investor and that the Company may accept or reject this subscription in whole or in part. The Investor agrees to be bound by all the terms and provisions of the Shareholder Agreement of the Company (as amended from time to time, the "Shareholder Agreement"), the form of which has been provided to Investor, along with the Certificate of Incorporation of the Company (as amended from time to time, the "Certificate of Incorporation"), and the Bylaws of the Company (as amended from time to time, the "Bylaws"). Capitalized terms used but not defined herein shall have the meaning given such terms in the Shareholder Agreement.

2.      <u>Closings</u>. The initial closing of the sale and purchase of the Shares will be held remotely via the parties' exchange of documents and signatures on the date of this Agreement, or at such other time and place as the parties hereto shall mutually agree. Additional sales of Shares may be made by the Company at one or more closings from time to time after the date of this Agreement. Each additional closing date shall take place remotely via the parties' exchange of documents and signatures.

3.      <u>Brief Description of Shares</u>. The following is a general description of the rights and preferences of the Shares. Each Investor should carefully read the Shareholder Agreement, Bylaws, and Certificate of Incorporation, as the below is merely a summary of such documents.

(a)      <u>Series B Preferred Stock</u>. The class of Shares being offered hereby will be referred to as the "Series B Preferred Stock" or the "Shares". The holders of the Series B Preferred Stock are referred to herein collectively as the "Series B Preferred Stockholders" and each a "Series B Preferred Stockholder." The holders of the Series B Preferred Stock will have first priority in the return of the issue price they paid for their Series B Preferred Stock, and, following the payment of the preferential payments to the Series A Preferred Stock, will thereafter participate pro rata in all other distributions of the Company. One share of Series B Preferred Stock will be issued for every $2.4303 of capital contributed to the Company. If the Series B Preferred Stock is fully subscribed, and assuming full conversion of all of our outstanding convertible securities that are entitled to convert into Series B Preferred Stock, 65,000,000 shares of Series B Preferred Stock will be issued in connection herewith, which may be issued at one or more closings. The holders of Series B Preferred Stock will also have limited veto rights in connection with the creation of any new senior capital stock as set forth in the Shareholder Agreement. The Series B Preferred Stockholders and those holding Series A Preferred Stock, Class A Common Stock, and Class S Common Stock are referred to herein collectively as the "Shareholders" and each a "Shareholder."

(b)      <u>Series A Preferred Stock</u>. A second series of preferred stock not being offered hereby will be referred to as the "Series A Preferred Stock." After the distributions to the Series B Preferred Stockholders, the Series A Preferred Stock will be entitled to the return of their unreturned capital contributions, and to participate in the income and profit of the Company.

(c)      <u>Common Stock</u>. Another class of stock not being offered hereby will be referred to as the "Class A Common Stock." The Class A Common Stock, which are owned by the founders of the Company and persons we refer to as the Special Common Holders, are entitled to participate in the income and profit of the Company. The Special Common Holders received their Class A Common Stock in connection with the Company's acquisition of substantially all of the assets of EcoGen, Inc. in August 2020. The Special Common Holders have certain anti-dilution rights, a put option, and voting rights, among other special rights, set forth in the Shareholder Agreement and that certain Put/Call Agreement by the Company and such Special Common Holders.

(d)      <u>Class S Common Stock</u>. A second series of common stock not being offered hereby will be referred to as the "Class S Common Stock." The Company has generally issued Class S Common Stock to service providers, and ceased offering new shares of Class S Common Stock in September 2020, and intends to identify alternative structures to provide equity incentives to service

SA-2

KW2_103089

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

providers on a going forward basis. Each share of Class S Common Stock is subject to a Hurdle Amount (as defined in the Certificate of Incorporation), and the holder of a share of Class S Common Stock is not entitled to distributions until total distributions with respect to all shares existing at the time of the issuance of such Class S Common Stock equal the Hurdle Amount of the Class S Common Stock.

4.      Representations and Warranties of the Investor.  To induce the Company to accept this subscription, the Investor represents and warrants as follows:

(a)      The Investor has been furnished and has carefully read a form of the Certificate of Incorporation, Bylaws, and Shareholder Agreement. The Investor has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Shares, is able to bear the risks of an investment in the Shares and understands the risks of, and other considerations relating to, a purchase of the Shares, including the matters set forth under the caption "Risk Factors" set forth on Appendix A attached hereto.

(b)      Investor has been cautioned that an investment in the Company is speculative and involves significant risks, and that it is not possible to foresee and describe all of the business, economic and financial risk factors which may affect the Company. Investor represents, warrants and acknowledges that it has carefully and thoroughly read and fully understands all of the risk factors described or discussed in this Subscription Agreement, including those set forth on Appendix A. Investor acknowledges that Investor has been advised to seek independent professional advice in order to carefully analyze the risks and merits of an investment in the Company. The risks set forth on Appendix A are not to be considered exhaustive or definitive of all of the risks involved in an investment in the Shares.

(c)      The Investor has not reproduced, duplicated, or delivered the Certificate of Incorporation, Bylaws, Shareholder Agreement, or this Subscription Agreement and accompanying documents (the "Offering Documents") to any other person, except professional advisors to the Investor as instructed by the Company. Notwithstanding the foregoing, the Investor (and each employee, agent, or representative of the Investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Company and all materials of any kind (including opinions or other tax analyses) that are provided to the Investor relating to such tax treatment and tax structure except to the extent maintaining such confidentiality is necessary to comply with any applicable federal or state securities laws.

(d)      Investor agrees that failing to remit the capital contribution and other consideration set forth on the signature page hereof will result in the Investor being considered in default and in breach of this Subscription Agreement.

(e)      The Shares to be acquired hereunder are being acquired by the Investor for the Investor's own account for investment purposes only and not with a view to resale or distribution.

(f)      The Investor understands that the Shares have not been registered under any securities laws and the transferability of such Shares is restricted. Any Shares acquired by the Investor may not be sold, assigned, gifted, transferred or otherwise disposed, nor will the vendee, assignee, beneficiary, or transferee be recognized as having acquired such Shares for any purposes, unless (a) a registration statement under the Securities Act of 1933, as amended (the "Securities Act"), with respect to such Shares shall then be in effect and such has been qualified under all applicable state securities laws, or (b) the availability of an exemption from such registration and qualification shall be established to the satisfaction of counsel for the Company. The Investor further understands that the Shares are further subject to restriction as to their sale, transfer, hypothecation, or assignment as set forth in the Shareholder Agreement.

SA-3

\4862-6139-5226

KW2_103090

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

(g)      To the full satisfaction of the Investor, the Investor has been furnished any materials the Investor has requested relating to the Company or the offering of the Shares, and the Investor has been afforded the opportunity to ask questions of representatives of the Company concerning the terms and conditions of the offering.

(h)      Other than as set forth herein or in the Offering Documents, the Investor is not relying upon any other information, representation or warranty by the Company, its affiliates or any agent or representative of them, written or otherwise, in determining to invest in the Company. The Investor has consulted to the extent deemed appropriate by the Investor with the Investor's own advisers as to the financial, tax, legal and related matters concerning an investment in the Shares and on that basis believes that an investment in the Shares is suitable and appropriate for the Investor.

(i)      If the Investor is not a natural person: (i) the Investor has the power and authority to enter into this Subscription Agreement, the Shareholder Agreement and each other document required to be executed and delivered by the Investor in connection with this subscription for the Shares, and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; and (ii) the person signing this Subscription Agreement on behalf of the Investor has been duly authorized to execute and deliver this Subscription Agreement, the Shareholder Agreement and each other document required to be executed and delivered by the Investor in connection with this subscription for the Shares. If the Investor is an individual, the Investor has all requisite legal capacity to acquire and hold the Shares and to execute, deliver and comply with the terms of each of the documents required to be executed and delivered by the Investor in connection with this subscription for the Shares. The execution and delivery by the Investor of, and compliance by the Investor with, this Subscription Agreement, the Shareholder Agreement and each other document required to be executed and delivered by the Investor in connection with this subscription for the Shares does not violate or represent a breach of, or constitute a default under, any instrument governing the Investor, any law, regulation or order, or any agreement to which the Investor is a party or by which the Investor is bound. This Subscription Agreement has been duly executed by the Investor and constitutes, and the Shareholder Agreement, when executed by the Investor, will constitute, a valid and legally binding agreement of the Investor, enforceable against it in accordance with its terms.

(j)      The Investor can afford a complete loss of its investment in the Company and can afford to hold its investment in the Company for an indefinite period of time.

(k)      The Investor was offered the Shares through private negotiations and in the state listed in the Investor's permanent address set forth in the Investor Questionnaire attached hereto (the "Investor Questionnaire"), and intends that the securities law of that state govern the Investor's subscription. If the Investor is not a resident of the United States, the Investor understands that it is the responsibility of the Investor to satisfy itself as to full observance of the law of any relevant territory outside the United States in connection with the offer and sale of the Shares, including obtaining any required governmental or other consent and observing any other applicable formalities.

(l)      The Investor is and will be an "accredited investor" as such term is defined in the Securities Act, both at the time of its initial purchase of Shares and at the time of any additional purchase of Shares.

(m)      In compliance with Rule 506(d) of Regulation D of the Securities Act, the Investor represents and warrants that the Investor, its members, managers, partners, trustees or any other "covered persons" (as defined in Rule 506(d) of Regulation D of the Securities Act), are not currently subject to or involved in a "disqualifying event" as defined in Rule 506(d) of Regulation D of the Securities Act (a "Bad Actor Event"), nor have they been subject to or involved in a Bad Actor Event within the ten years preceding

SA-4

\4862-6139-5226

KW2_103091

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

the date on the signature page of these Subscription Documents.

(n)     Investor agrees to notify the Company in the event that it or any of its members, managers, partners, trustees of any other "covered persons" (as defined in Rule 506(d) of Regulation D of the Securities Act), become subject to a Bad Actor Event. Such notification shall be made within thirty (30) days of Investor obtaining such knowledge. If Investor is a partnership, limited liability company, S corporation, grantor trust, or other entity in which beneficial owners of interests in the entity are taxed on the operations of the entity including any other "flow through entity" within the meaning of Treasury Regulation Section 1.7704-1(h)(3) (collectively a "flow through entity"), such Investor represents that use of the flow through entity to acquire the Shares, in contrast to investments in Shares by the beneficial owners of interests in the flow-through entity themselves, is not motivated by efforts to limit the number of members or unit holders in the Company to fewer than one hundred (100) in order that the Company qualify for an exemption to the rules governing classification of certain entities as "publicly traded partnerships" as defined in Internal Revenue Code Section 7704.

5.     Tax Information. The Investor represents, warrants and agrees (for the benefit of the Company and of any person who participated in the offer or sale of the Shares) that it will provide to the Company in a timely manner a properly completed United States Internal Revenue Service Tax Form W-8BEN or other applicable W-8 series form(s) (a foreign person certificate ) or W-9 (a U.S. person certificate), as appropriate, and shall cooperate with the Company in order to maintain appropriate records and provide for withholding amounts, if any, relating to the Shares, and, further, in the event that the Investor fails to timely provide such information, the Company and its direct and indirect members, managers, officers, directors, employees, agents, service providers and their Affiliates shall have no obligation or liability to the Investor with respect to any United States tax matters or obligations that may be assessed against the Investor or its beneficial owners. The Investor expressly acknowledges that such tax forms and withholding information may be provided to any withholding agent that has control, receipt or custody of the income of which the Investor is the beneficial owner or any withholding agent that can disburse or make payments of the income of which the Investor is the beneficial owner.

6.     Source and Use of Funds. Neither the Investor, nor any person having a direct or indirect beneficial interest in the Shares to be acquired, appears on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC"), nor are they otherwise a party with which the Company is prohibited to deal under the laws of the United States.

(a)     The Investor further represents that the monies used to fund the investment in the Shares are not derived from, invested for the benefit of, or related in any way to, the governments of, or persons within: (i) any country under a U.S. embargo enforced by OFAC; (ii) that has been designated as a "non-cooperative country or territory" by the Financial Action Task Force on Money Laundering; or (iii) that has been designated by the U.S. Secretary of the Treasury as a "primary money-laundering concern."

(b)     The Investor further represents and warrants that the Investor (i) has conducted thorough due diligence with respect to all of its beneficial owners; (ii) has established the identities of all beneficial owners and the source of each of the beneficial owner's funds; and (iii) will retain evidence of any such identities, any such source of funds and any such due diligence.

(c)     The Investor further represents that the Investor does not know or have any reason to suspect that: (i) the monies used to fund the Investor's investment in the Shares have been or will be derived from or related to any illegal activities, including but not limited to, money laundering activities; and (ii) the proceeds from the Investor's investment in the Shares will be used to finance any illegal activities.

SA-5

\4862-6139-5226

KW2_103092

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

7.      Further Advice and Assurances.  All information that the Investor has provided to the Company; including the information in this Subscription Agreement and in the Investor Questionnaire, is true, correct and complete as of the date hereof, and the Investor agrees to notify the Company immediately if any representation, warranty or information contained in this Subscription Agreement, including the Investor Data Sheet and Investor Questionnaire, becomes untrue at any time. The Investor agrees to provide such information and execute and deliver such documents regarding itself and all of its beneficial owners as the Company may reasonably request from time to time to verify the accuracy of the Investor's representations and warranties herein or to comply with any law, rule or regulation to which the Company may be subject, including compliance with anti-money laundering laws and regulations, or for any other reasonable purpose.

8.      Indemnity.  The Investor understands that the information provided herein will be relied upon by the Company for the purpose of determining the eligibility of the Investor to purchase the Shares in the Company.  The Investor agrees to provide, if requested, any additional information that may reasonably be required to determine the eligibility of the Investor to purchase Shares in the Company.  The Investor agrees to indemnify and hold harmless the Company and each Shareholder from and against any loss, damage or liability due to or arising out of a material breach of any representation, warranty or agreement of the Investor contained in this Subscription Agreement (including the Investor Data Sheet and Investor Questionnaire) or in any other document provided by the Investor to the Company or in any agreement (other than the Shareholder Agreement) executed by the Investor with the Company in connection with the Investor's investment in the Shares.  Notwithstanding any provision of this Subscription Agreement, the Investor does not waive any rights granted to it under the Shareholder Agreement or applicable securities laws.

9.      Miscellaneous.  This Subscription Agreement is not assignable by the Investor without the prior written consent of the Board.  The representations and warranties made by the Investor in this Subscription Agreement (including the Investor Data Sheet and Investor Questionnaire attached hereto) shall survive the closing of the transactions contemplated hereby and any investigation made by the Company.  The Investor Questionnaire, including without limitation the representations and warranties contained therein, is an integral part of this Subscription Agreement and shall be deemed incorporated by reference herein.  This Subscription Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument, and shall be governed by and construed in accordance with the laws of the State of Delaware.  Upon the occurrence of any dispute or disagreement between the Investor and the Company arising out of or in connection with any term or provision of this Subscription Agreement, the subject matter hereof, or the interpretation or enforcement hereof (in each case, a "Dispute"), the parties shall submit the Dispute to final and binding arbitration in Orange County, California, administered by JAMS, or its successor, in accordance with the rules and procedures of JAMS then in effect. The Investor agrees that any and all Disputes that are submitted to arbitration in accordance with this Subscription Agreement shall be decided by one (1) neutral arbitrator who is a retired judge or attorney who is experienced in complex commercial transactions. If the parties are unable to agree on an arbitrator, JAMS shall designate the arbitrator. The parties will cooperate with JAMS and with one another in selecting the arbitrator and in scheduling the arbitration proceedings in accordance with applicable JAMS procedures. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures (https://www.jamsadr.com/rules-comprehensive-arbitration/).  Any party may commence the arbitration process called for in this Subscription Agreement by filing a written demand for arbitration with JAMS, with a copy to the other party.  The Investor irrevocably and unconditionally consents to the exclusive jurisdiction of JAMS to any dispute, claim or controversy arising out of or relating to this Subscription Agreement, including the determination of the scope or applicability of this agreement to arbitrate, and further consents to the jurisdiction of any state court of the State of California or any federal court located in the State of California for the purpose of enforcing the arbitration provisions of this Section 8 or hearing any other dispute, claim, or controversy under this Subscription Agreement (including

\4862-6139-5226

KW2_103093

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

enforcement of any award of specific performance and any claim for any provisional remedy, temporary, preliminary or permanent injunctive relief or other equitable relief). The prevailing party in any legal proceeding will be entitled to recover as an element of such party's cost of arbitration, suit or proceeding, and not as damages, reasonable attorneys' fees to be fixed by the arbitrator or by the court.

10.    Distributions. Distributions to the Investor in respect of the Shares shall be made as specified in the Investor Data Sheet or as otherwise specified in writing by the Investor to the Company.

11.    Tag-Along Sale. Capitalized terms used but not defined herein shall have the meaning givens such terms in the Shareholder Agreement.

(a)    If Todd Davis or Erick Dickens (in each case, either directly or indirectly, including, without limitation, any Family or Affiliates that such Person controls) (each, a "Founder"). desires to Dispose of all or a portion of its Shares other than to a Permitted Transferee (each, a "Third-Party Purchaser"), such Founder must first give written notice of such intent to the Investor, which notice shall state the name of the Third-Party Purchaser, the price, and the general terms and conditions of such Disposition (the "Transfer Notice"). Investor may elect to exercise its right to participate with the Founder in the proposed Disposition (the "Tag-Along Sale") on the same terms and conditions specified in the Transfer Notice (or on such other terms and conditions that are no more favorable to the proposed purchaser than the terms and conditions contained in the Transfer Notice).

(b)    If Investor desires to exercise this tag-along right, Investor must give the Founder a written notice prior to the expiration of fifteen (15) days following delivery of the Transfer Notice. If Investor elects to participate in such Disposition (each such Person so electing to participate, whether pursuant to this Subscription Agreement or the Shareholder Agreement, is a "Tag-Along Shareholder"), each Tag-Along Shareholder will be entitled to sell in the contemplated Disposition, at the same price and on the same terms, the number of Shares equal to the product of (i) the quotient determined by dividing (A) the Percentage Interest of the Tag-Along Shareholder by (B) the aggregate Percentage Interest of the Founder and all such Tag-Along Shareholders, multiplied by (ii) the number of Shares to be sold in the Tag-Along Sale.

For example, if the offer contemplated a sale of 20 Shares by the Founder, and if the Founder at such time owns 75% of all Shares and if the Tag-Along Shareholders own 10% of all Shares, the Tag-Along Shareholders would be entitled to sell 2.35 Shares ((10% ÷ 85%) x 20 Shares) and the Founder would be entitled to sell 17.65 Shares ((75% ÷ 85%) x 20 Shares).

(c)    The Founder will not Dispose of any of its Shares to the prospective transferee if the prospective Third-Party Purchaser declines to allow the participation of any Tag-Along Shareholder, provided that each Tag-Along Shareholder shall within the prescribed time cause to be discharged any and all encumbrances of, and security interests in, its Shares and provide written evidence of such discharges (other than encumbrances under this Agreement or the other organization documents of the Company).

(d)    If the closing of such Tag-Along Sale does not occur within ninety (90) days after the date of the Transfer Notice with respect thereto, or if the actual terms and conditions of the Tag-Along Sale are not substantially identical to those set forth in the Transfer Notice (or on such other terms and conditions that are no more favorable to the proposed purchaser than the terms and conditions contained in the Transfer Notice), the Tag-Along Shareholders shall be entitled to revoke their election to participate in such Tag-Along Sale, in which event any subsequent Disposition of Shares by such Founder shall once again become subject to the provisions of this Section 11. The exercise or non-exercise of the rights of an Investor hereunder to participate in one or more sales of Shares made by a Founder shall not adversely affect an Investor's right to participate in subsequent sales of Shares.

SA-7

\4862-6139-5226

KW2_103094

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

(e)      In the event that the Tag-Along Shareholders are required to make any representations or indemnities in connection with a Tag-Along Sale, then (i) no Tag-Along Shareholder shall be required to make any representations, warranties or indemnities in such Tag-Along Sale that are different than the representations, warranties and indemnities made by all other Shareholders in such Tag-Along Sale, and no Tag-Along Shareholder shall be required to make any representations or warranties other than those provided for in clause (iv) below, (ii) no Tag-Along Shareholder shall be liable for the inaccuracy of any representation or warranty, nor any indemnity associated therewith, made by any other Person in connection with a Tag-Along Sale, other than the Company, provided that any liability for breach of any representation, warranty, covenant or agreement related to the Company shall be allocated among each Tag-Along Shareholder transferring Shares in the Tag-Along Sale, pro rata based on the consideration received by each Shareholder in the Tag-Along Sale, (iii) such representations, warranties and indemnities shall be several and not joint and each Tag-Along Shareholder shall not be liable for more than the value of the consideration received by such Person for its Shares in such Tag-Along Sale, and (iv) all representations and indemnities made by a Tag-Along Shareholder concerning such Shareholder's valid ownership of such Shareholder's Shares, free of all liens and other encumbrances (other than those arising under applicable securities laws and this Agreement), such Shareholder's authority, power and right to enter into and consummate such Tag-Along Sale, without violating any other agreement or any applicable law and, if applicable, such Shareholder's qualification to acquire and hold any securities issued to such Shareholder in connection with such Tag-Along Sale (including any representations and indemnities customarily provided in connection with the acquisition of securities by an investor thereof) shall be the sole responsibility of such Shareholder and no other Shareholder shall be liable therefor.  None of the Tag-Along Shareholders shall be required to enter into any non-competition or other restrictive covenant arrangement (other than with regards to confidentiality) in connection with any Tag-Along Sale.

12.      Legal Fees. Each party to this Subscription Agreement shall bear its own expenses incurred in the negotiation and preparation of this Subscription Agreement and in connection with all obligations required to be performed by such party under this Subscription Agreement, provided that the Company shall reimburse the Investor, together with all other Investors executing this form of Subscription Agreement, up to an aggregate amount of $25,000 of their attorneys' fees in connection with this Subscription Agreement.

*[Remainder of page intentionally left blank]*

\4862-6139-5226

KW2_103095

**IN WITNESS WHEREOF,** the Investor has executed this Subscription Agreement as of the date set forth below and represents that the information in this Subscription Agreement is accurate and complete and with respect to all of the information disclosed in this Subscription Agreement, has executed this Subscription Agreement under penalties of perjury.

Date:  March 31, 2022

Amount of Capital Contribution: These Shares are being issued as the "Closing Payment" pursuant to that certain Unit Purchase Agreement by and among the Company, Kadenwood Personal and Pet Care LLC, e2e Pharma, LLC, and the Sellers named therein, dated March 31, 2022.

Number of Shares:  __860,396_____

*For Individual Investors:*

_____          _____
(Please Print Name of Investor #1)                                      (Please Print Name of Investor #2)

By: _____          By: _____
      Signature                                                                      Signature

*For Investors other than Individuals:*

R&R AZ Investments, LLC_____
(Please Print Name of Investor)

By: *Brent Roland*
Signature  E67+8FE39D45417...

__Brent Roland_____
(Please Type Name and Title of Signatory)

*Note: Please sign this Subscription Agreement Signature Page and return it to the Company, who will return a copy of this page to you upon acceptance into the Company.*

**For Company Use Only**
**Do not write below this point**

The Subscription is hereby accepted in the amount set forth above as of March 31__, 2022.

Kadenwood, Inc.
By: _____
Name: Erick Dickens
Title: CEO
Date:  3/31/2022

*[Subscription Agreement Signature Page]*

\4862-6139-5226

KW2_103096

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

Acknowledged and agreed with respect to <u>Section 11</u> of this Subscription Agreement:

Todd Davis

Erick Dickens

SA-2

\4862-6139-5226

KW2_103097

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

## INVESTOR DATA SHEET

Individual:

1. **Print Full Name of Investor:**

_____

First          Middle         Last

Partnership, Corporation, Trust, Limited Liability
Company, Custodial Account, Other:

R&R AZ Investments LLC
_____
Name of Entity

2. **U.S. Taxpayer Identification or Social Security Number:**

85-3627571

3. **Primary Contact Information:**

Name:           Brent Roland

Title:           Managing Partner

Company:           R&R AZ Investments LLC

Street Address:           7605 N. Shadow Mountain Rd.

Floor or Suite No.:           

City, State Zip:           Paradise Valley, AZ 85253

Country:           USA

Telephone:           480-290-1587

Fax:           

Email:           brent.a.roland@gmail.com

4. **Investor Permanent Address (if different from address for notices above):**

Street Address:           _____

Floor or Suite No.:           _____

City, State Zip:           _____

Country:           _____

IQ-1

\4862-6139-5226

KW2_103098

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

5.  **Wiring Instructions for Cash Distributions:**

| | |
|---|---|
| Name of bank: | Western Alliance Bank |
| ABA number: | 122105980 |
| Account name: | R&R AZ Investments LLC |
| Account number: | 8320603522 |
| FFC name: | |
| FFC number: | |
| Contact name: | Brent Roland |
| Contact telephone: | 480-290-1587 |

IQ-2

\4862-6139-5226

KW2_103099

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

## INVESTOR QUESTIONNAIRE

### A.    General Information

Individual:

Print Full Name of Investor:

_____

First            Middle            Last

Partnership, Corporation, Trust, Limited Liability Company, Custodial Account, Other:

    R&R AZ Investments LLC_____
                    Name of Entity

### B.    U.S./Non-U.S. and Related Tax Information

The Investor represents and warrants that he, she or it:

☒    (a) is a U.S. Person (as defined below); (b) is not a nonresident alien, foreign corporation, foreign partnership, foreign trust or foreign estate (each as defined in the Internal Revenue Code of 1986, as amended the "Code"); and (c) will notify the Company immediately of any change in the status referenced in the foregoing clause (a) of this Section B (and, in connection therewith, timely submit to the Company an updated IRS Form W-8 or W-9, as applicable). The Investor will complete and timely return with this Subscription Agreement an IRS Form W-9, Payer's Request for Taxpayer Identification Number and Certification.

☐    (x) is a Non-U.S. Person (as defined below); (y) will notify the Company immediately of any change in the status referenced in the foregoing clause (x) of this Section B (and, in connection therewith, timely submit to the Company an updated IRS Form W-8 or W-9, as applicable); and (z) is not subscribing on behalf of or funding its capital contribution with funds obtained from U.S. Persons. The Investor will complete and return with this Subscription Agreement IRS Form W-8BEN (or other applicable Form (or, if applicable, Forms) W-8), Certification of Foreign Status of Beneficial Owner for United States Tax Withholding.

The Investor certifies under penalties of perjury that the Investor's name, taxpayer identification number and address provided in the Investor Questionnaire are correct. The Investor agrees to execute properly and timely provide to the Company in a timely manner any tax documentation that may be reasonably requested by the Company in connection with the Company. For purposes of hereof, "U.S. Person" shall have the meanings set forth in Section 7701 (a)(30) of the Code, and "Non-U.S. Person" means an individual, association, corporation, partnership, trust, or estate that is not a U.S. Person.

### C.    Accredited Investor Status

The Investor represents and warrants that the Investor is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), and has checked the box or boxes below which are next to the category or categories under which the Investor qualifies as an accredited investor. If requested by the Company, the Investor agrees to provide to the Company in a timely manner any certification documentation set forth herein to verify such Investor's accreditation status.

IQ-3

\4862-6139-5226

KW2_103100

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

**FOR INDIVIDUALS:**

☐    (A)    I certify that I am an accredited investor because I have an individual net worth, or my spouse and I have a combined net worth, in excess of $1,000,000. *For purposes of this questionnaire, "net worth" means the excess of total assets at fair market value, including principal residence, but only if the current encumbrances on the primary residence exceed the fair market value of the principal residence,[1] home furnishings and automobiles, over total liabilities[2].*

☐    (B)    I certify that I am an accredited investor because I had individual income (exclusive of any income attributable to my spouse or spousal equivalent[3]) of more than $200,000 for each of the past two years or joint income with my spouse or spousal equivalent in excess of $300,000 in each of those years and I reasonably expect to reach the same income level in the current year.[4]

☐    (C)    I certify that I am an accredited investor because I am a holder in good standing of one or more of the following certifications or designations administered by the Financial Industry Regulatory Authority, Inc. (FINRA): the Licensed General Securities Representative (Series 7), Licensed Investment Adviser Representative (Series 65), or Licensed Private Securities Offerings Representative (Series 82).

☐    (D)    I certify that I am an accredited investor because I am a "family client," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), of a family office as defined in rule 202(a)(11)(G)-1 under the Advisers Act, (i) with assets under management in excess of $5,000,000, (ii) that is not formed for the specific purpose of acquiring the securities offered, and (iii) whose prospective investment is directed by a person who has such knowledge and experience in financial and business matters that such family office is capable of evaluating the merits and risks of the prospective investment, and whose prospective investment is directed by such family office pursuant to clause (iii) of this sentence.

**FOR ENTITIES:**

☒    (E)    An entity, including a grantor trust, in which all of the equity owners are accredited investors (for this purpose, a beneficiary of a trust is not an equity owner, but the grantor of a grantor trust is an equity owner).

☐    (F)    A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act

---

[1] Notwithstanding anything to the contrary herein, for purposes of determining "net worth," the principal residence owned by an individual shall be excluded from the net worth calculation.

[2] Total Liabilities excludes any mortgages on principal residence, but includes any incremental encumbrances that the individual incurred using the principal residence as security for the encumbrance and were incurred within sixty (60) days of the date listed on the signature page of this subscription agreement.

[3] For purposes of this Questionnaire, a "spousal equivalent" means a cohabitant occupying a relationship generally equivalent to that of a spouse.

[4] For purposes of this Questionnaire, individual income means adjusted gross income, as reported for federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (but not including any amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any tax-exempt interest income under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), received, (ii) the amount of losses claimed as a partner in a partnership as reported on Schedule E of Form 1040, (iii) any deduction claimed for depletion under Section 611 et seq. of the Code, (iv) amounts contributed to an Individual Retirement Account (as defined in the Code) or Keogh retirement plan, (v) alimony paid, and (vi) any elective contributions to a cash or deferred arrangement under Section 401(k) of the Code.

IQ-4

\4862-6139-5226

KW2_103101

whether acting in its individual or fiduciary capacity.

☐    (G)    An insurance company as defined in Section 2(a)(13) of the Securities Act.

☐    (H)    A broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended.

☐    (I)    An investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act").

☐    (J)    A business development company as defined in Section 2(a)(48) of the Investment Company Act.

☐    (K)    A small business investment company licensed by the Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

☐    (L)    A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act").

☐    (M)    A corporation, limited liability company, partnership, business trust, not formed for the purpose of acquiring the Shares, or an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, in each case with total assets in excess of $5 million.

☐    (N)    A trust with total assets in excess of $5 million not formed for the specific purpose of acquiring the Shares, whose purchase is directed by a person with such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Shares.

☐    (O)    An employee benefit plan within the meaning of ERISA if the decision to invest in the Shares is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5 million or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

☐    (P)    A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if the plan has total assets in excess of $5 million.

☐    (Q)    An entity, of a type not listed in any of the paragraphs above, which was not formed for the specific purpose of acquiring the Shares, owning investments in excess of $5 million.

☐    (R)    A "family office," as defined in rule 202(a)(11)(G)-1 under the Advisers Act, (i) with assets under management in excess of $5,000,000, (ii) that is not formed for the specific purpose of acquiring the securities offered, and (iii) whose prospective investment is directed by a person who has such knowledge and experience in financial and business matters that such family office is capable of evaluating the merits and risks of the prospective investment.

☐    (S)    A "family client," as defined in rule 202(a)(11)(G)-1 under the Advisers Act, of a family office meeting the requirements in the above paragraph and whose prospective investment is directed by such family office pursuant to clause (iii) of the above paragraph.

IQ-5

\4862-6139-5226

KW2_103102

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

## INVESTOR QUESTIONNAIRE SIGNATURE PAGE

The Investor understands that the foregoing information will be relied upon by the Company for the purpose of determining the eligibility of the Investor to purchase and own the Shares in the Company. The Investor agrees to notify the Company immediately if any representation, warranty or information contained in the Subscription Agreement, including this Investor Questionnaire becomes untrue at any time. The Investor agrees to provide such information and execute and deliver such documents regarding itself and all of its beneficial owners as the Company may reasonably request from time to time to substantiate the Investor's status as or to otherwise determine the eligibility of the Investor to purchase the Shares in the Company, to verify the accuracy of the Investor's representations and warranties herein or to comply with any law, rule or regulation to which the Company may be subject, including compliance with anti-money laundering laws and regulations, or for any other reasonable purpose. To the fullest extent permitted by law, the Investor agrees to indemnify and hold harmless the Company and each Shareholder from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained in this Investor Questionnaire, the Subscription Agreement, the Investor Data Sheet or the Investor Questionnaire, or in any other document provided by the Investor to the Company or in any agreement executed by the Investor with the Company in connection with the Investor's investment in the Shares.

*For Individual Investors:*

_____          _____
*(Please Print Name of Investor #1)*          *(Please Print Name of Investor #2)*


By: _____          By:_____
      Signature                                          Signature


*For Investors other than Individuals:*

R&R AZ Investments, LLC
_____
*(Please Print Name of Investor)*

DocuSigned by:

By: *Brent Roland*
_____
Signature  5417...

Brent Roland
_____
*(Please Type Name and Title of Signatory)*


*[Investor Questionnaire Signature Page]*

\4862-6139-5226

**KW2_103103**

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9   ID #:230

Appendix A

## RISK FACTORS

**THE SHARES ARE HIGHLY SPECULATIVE, INVOLVE A HIGH DEGREE OF RISK AND SHOULD BE ACQUIRED ONLY BY PERSONS WHO CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT. PRIOR TO ACQUIRING THE SECURITIES AND MAKING AN INVESTMENT DECISION, PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER THE RISKS, INCLUDING BUT NOT LIMITED TO, THE FOLLOWING HIGH RISKS ASSOCIATED WITH THE SHARES.**

### GENERAL RISKS

*The Company's projections, assumptions, and/or models may be inaccurate or incomplete.*

It is impossible to predict accurately the results of an investment in the Company. The Company's business model depends on various assumptions, any variation of which may yield different results. Before making any investment, prospective investors should examine the Company carefully and conduct their own due diligence.

*The Company has a limited operating history.*

The Company was formed on February 19, 2019 and has a limited operating history. Consequently, the Investors do not have access to the kind of information in assessing an investment in the Shares in the Company that would be available if the Company had a more comprehensive operating history, and the Company's proposed operations are subject to all of the risks inherent in a new business enterprise. The Company has had limited revenues to date on which to base an evaluation of its business and prospects. The likelihood of the success of the Company must be considered in light of the problems, expenses, difficulties, complications, and delays frequently encountered in connection with the start-up of new businesses and the environment in which the Company will operate.

Although members of the Board of Directors ("Directors") and their affiliates have prior experience in the CBD and/or consumer products industry generally, there can be no assurance that the Company will perform as expected or in a manner similar to any prior businesses affiliated with any of the Directors or their affiliates.

Potential investors should be aware that by purchasing Shares they will not acquire any ownership interest in any entities or investments owned or managed by the Directors or their affiliates other than in the Company.

*The Company's performance is affected by general economic and political conditions and taxation policies.*

The success of the activities of the Company may be affected by general economic and market conditions, like interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws, and tax laws and policies, and United States and international political circumstances. These factors may affect the ability to grow the business. Unexpected volatility or illiquidity could impair profitability or result in losses.

*Company bank deposits will likely exceed FDIC insurance limits.*

The Company's cash, including subscription receipts, will be held in bank depository accounts. While as of the date of this Subscription Agreement, the FDIC insures deposits up to $250,000 per depositor

A-1

\4862-6139-5226

KW2_103104

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

per insured institution in most cases, the Company may have deposits at financial institutions in excess of the FDIC limits. The failure of any financial institution in which the Company has funds on deposit in excess of the applicable FDIC limits may result in the Company's loss of the excess amounts, which would adversely impact the Company's performance.

## RISKS RELATED TO THE COMPANY

| | |
|---|---|
| ***Shareholders Must Rely on Management*** | Except as otherwise set forth in the Shareholder Agreement and the Certificate of Incorporation, and as expressly required by Delaware law, the Board of Directors will have the right to make almost all decisions with respect to the management of the Company and investment of the proceeds of this offering of the Shares. No persons should purchase Shares unless they are willing to entrust virtually all aspects of the management of the Company to the Board of Directors. The Board of Directors may retain others for compensation to provide services to the Company. Those other parties may have no fiduciary duty to the Shareholders, and may not perform as expected. |
| ***Directors are not required to devote full time to the business of the Company.*** | The Directors are not required to devote their full time to the Company's affairs, but only time as the affairs of the Company may reasonably require. |
| ***The Directors Will Receive Certain Base Compensation Independent of the Financial Performance of the Company.*** | The Directors are entitled to receive compensation, payments and reimbursements in exchange for their services rendered, regardless of whether the Company operates at a profit or a loss. |
| ***Conflicts of Interest*** | The Directors and their affiliates are engaged in other activities and intend to continue to engage in other activities in the future. The Directors and their affiliates and their principals will therefore have conflicts of interest in allocating management time, services and functions between various existing enterprises and future enterprises the Directors and their affiliates may organize, as well as other business ventures in which the Directors and their affiliates may be or may become involved. |
| | Moreover, the Certificate of Incorporation expressly renounces any interest or expectancy of the Company in any matter, transaction, or interest that is presented to or comes into the possession of a Director who is not an employee of the Company. |
| ***The Company's directors and officers will have limited liability to the Company and the shareholders, and will be entitled to indemnification by the Company.*** | The Company's Bylaws and Certificate of Incorporation provides that the Company's directors will not generally be liable to the Company or to the investors for any action or inaction. In addition, the Company's directors and officers generally will be indemnified by the Company for any expense or loss they incur on behalf of the Company or in conducting the Company's business. |
| ***Most Shareholders do not have Tag-Along Rights*** | The Shareholder Agreement does not provide the Shareholders (other than the Special Common Holders and certain other specified |

A-2

\4862-6139-5226

KW2_103105

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

holders) any tag-along rights, or otherwise permit Shareholders to cause a proportionate amount of such Shareholder's Shares to be sold with and on the same terms as sales of other Shares of the Company. This means that some Shareholders, including the founding shareholders, may completely liquidate their ownership interests in the Company without providing the other Shareholders the right to sell their Shares on the same terms (other than the Special Common Holders and certain other specified holders, who have a limited tag-along right as set forth in the Shareholder Agreement).

| | |
|---|---|
| *Shareholders May Have Limited Liability to the Company.* | Under the Delaware General Corporation Law, in general, the liability of each shareholder for the obligations of the Company generally will not exceed such shareholder's capital contributions and such shareholder's share of undistributed profits of the Company. |

## RISKS RELATING TO THE BUSINESS OF THE COMPANY

*The Company is Susceptible to Unknown Variables Regarding Implementation of the Farm Bill and US Laws*

There are several risks inherit in engaging in CBD consumer products business. The 2018 Farm Bill, also known as the Agricultural Improvement Act of 2018, modified the Controlled Substances Act to exempt hemp from the definition of marijuana, which means hemp is not a Schedule I drug, and states and tribes cannot interfere with the interstate transport of hemp and hemp products. Despite the 2018 Farm Bill, there are still unanswered questions and inherent risks in engaging in the Company's business.

First, the protection of the provision of the 2018 Farm Bill that prohibits states from interfering with the interstate transport of hemp and hemp products is limited to hemp cultivated in accordance with Section 10113 of the 2018 Farm Bill. Under Section 10113, states must devise a plan to license and regulate hemp and submit such plan to the USDA for approval, and under such plan a state may establish jurisdiction over hemp cultivation. In October 2019, the USDA released interim hemp rules to provide specific guidance for state departments of agriculture and tribal government plans. Various states are in the process of applying to the USDA for approval of their U.S. hemp production regulations which impose different levels of regulation and costs on the production of U.S. hemp and certain state plans have been approved by the USDA. On January 19, 2021, the USDA published its final rule, which went into effect on March 22, 2021. Under the new guidance, the USDA will delay enforcement of the requirement for labs to be registered by the DEA until January 1, 2022, and allows for alternative disposal methods of non-compliant hemp that do not require the use of a DEA-registered reverse distributor or law enforcement. Moreover, the 2018 Farm Bill provides that its provisions do not preempt or limit state laws that regulate the production of U.S. hemp. Accordingly, some states may choose to restrict or prohibit some or all U.S. hemp production or sales within the state and variances in states' laws and regulations on U.S. hemp are likely to persist. Further, each state has discretion to develop and implement its own laws and regulations governing the manufacturing, marketing, labeling, and sale of U.S. hemp products, which is anticipated to create a patchwork of different regulatory

A-3

\4862-6139-5226

KW2_103106

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

schemes applicable to such products.

Under the 2018 Farm Bill, the FDA has retained authority over the Federal Food, Drug, and Cosmetic Act-regulated products (e.g., drugs (human and animal), food (human and animal), dietary supplements and cosmetics) containing U.S. hemp and U.S. hemp-derived ingredients, including CBD. The FDA has consistently taken the position that CBD, whether derived from U.S. hemp or U.S. Schedule 1 cannabis, is prohibited from use as an ingredient in food and dietary supplements. This stems from its interpretation of the exclusionary clauses in the Federal Food Drug & Cosmetic Act because CBD is the active ingredient in a drug that has been approved as a prescription drug and is the subject of substantial clinical investigations as a drug, which have been made public. The exclusionary clauses under the Federal Food Drug & Cosmetic Act provide that a substance that has been approved and/or has been subject to substantial clinical investigations as a drug may not be used in a food or dietary supplement, unless the substance was first marketed in a food or dietary supplement prior to the initiation of substantial clinical investigations of the substance as a drug.

Until the FDA formally adopts regulations with respect to CBD products or announces an official position with respect to CBD products, there is a risk that the FDA could take enforcement action (e.g., "Warning Letter," seizure, injunction) against the Company's U.S. hemp-derived CBD products sold in the U.S.

Even at the state-level in states where cannabis is legal, there are still risks to selling food products containing CBD, as certain of such states, such as the State of Washington, still prohibit the use of industrial hemp as the source of CBD to be added to food products. In addition to civil penalties, the Company could be subject to a broad range of enforcement tactics ranging from embargos and license terminations, to seizure of products and criminal penalties.

Thus, the legal landscape of the Company's primary products and business objectives is still unclear, and subject to change in the near future. It is expected that this will have an impact on the operations of the Company. These changes may require the Company to incur substantial costs associated with legal and compliance fees and ultimately require the Company to alter our business plan. Furthermore, violations of these laws, or alleged violations, could disrupt the Company's business and result in a material adverse effect on the Company's operations.

Further, there is no guarantee that at some future date, voters and/or the applicable legislative bodies will not repeal, overturn or limit any such legislation legalizing the sale, disbursement and consumption of hemp or CBD. It is also important to note that local and city ordinances may strictly limit and/or restrict disbursement of hemp or CBD in a manner that will make it extremely difficult or impossible to transact business that is necessary for the continued operation of the hemp and CBD industry. Federal actions against any individual or entity engaged in the hemp industry or a substantial repeal of

A-4

\4862-6139-5226

KW2_103107

hemp-related legislation could adversely affect the Company, its business and its investments.

| | |
|---|---|
| *The Company will incur significant costs for regulatory compliance.* | The Company may need to incur significant ongoing costs and obligations related to its investment in infrastructure and growth and for regulatory compliance, which could have a material adverse impact on the Company's results of operations, financial condition and cash flows. In addition, future changes in regulations, more vigorous enforcement thereof or other unanticipated events could require extensive changes to the Company's operations, increased compliance costs or give rise to material liabilities, which could have a material adverse effect on the business, results of operations and financial condition of the Company. |
| *The Company's business is competitive.* | The Company operates in a competitive and rapidly evolving market. There is potential that the Company will face intense competition from other companies, some of which can be expected to have longer operating histories and more financial resources and experience than the Company. Increased competition by larger and better financed competitors could materially and adversely affect the business, financial condition, results of operations or prospects of the Company. Moreover, competition in the hemp and hemp CBD industry will likely intensify as more laws and regulations regarding hemp and hemp CBD are passed, including the 2018 Farm Bill and the rules promulgated thereunder. |
| | Because of the early stage of the industry in which the Company operates, the Company expects to face additional competition from new entrants. To become and remain competitive, the Company will require research and development, marketing, sales and support. The Company may not have sufficient resources to maintain research and development, marketing, sales and support efforts on a competitive basis which could materially and adversely affect the business, financial condition, results of operations or prospects of the Company. |
| | In addition, competition may drive the prices of the Company's products down, which may have a materially adverse effect on its results of operations in future periods. |
| *Reputational Risks to Third Parties.* | The parties with which the Company does business may perceive that they are exposed to reputational risk as a result of the Company's hemp and hemp CBD business activities. While the Company has banking relationships and believes that its required third-party services can be procured from other institutions, the Company may in the future have difficulty establishing or maintaining bank accounts or other business relationships. Failure to establish or maintain business relationships could have a material adverse effect on the Company. |
| *Unfavorable Publicity or Consumer Perception* | The hemp and hemp CBD industry is highly dependent upon consumer perception regarding the safety, efficacy, and quality of the product produced. Consumer perception can be significantly |

A-5

\4862-6139-5226

KW2_103108

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

influenced by scientific research or findings, regulatory investigations, litigation, media attention and other publicity regarding the consumption of such products. There can be no assurance that future scientific research or findings, regulatory investigations, litigation, media attention or other publicity will be favorable to the hemp and hemp CBD market or any particular product, or consistent with earlier publicity. Future research reports, findings, regulatory investigations, litigation, media attention or other publicity that are perceived as less favorable than, or that question, earlier research reports, findings or other publicity could have a material adverse effect on the demand for hemp and hemp CBD and on the business, results of operations, financial condition, cash flows or prospects of the Company. Further, adverse publicity reports or other media attention regarding the safety, efficacy and quality of hemp in general, or associating the consumption of hemp and hemp CBD with illness or other negative effects or events, could have such a material adverse effect. There is no assurance that such adverse publicity reports or other media attention will not arise.

*Product Liability.*

As a manufacturer and distributor of CBD and related products designed for use by humans and pets, the Company would face an inherent risk of exposure to product liability claims, regulatory action and litigation if its products are alleged to have caused significant loss or injury. In addition, tampering by unauthorized third parties or product contamination with respect to the hemp used in the Company's products may impact the risk of injury to consumers. Previously unknown adverse reactions resulting from human consumption of hemp alone or in combination with other medications or substances could occur. As a manufacturer and distributor of CBD and related products, or in its role as an investor in or service provider to an entity that is a manufacturer, distributor and/or retailer of hemp and hemp CBD, the Company may be subject to various product liability claims, including, among others, that the CBD product caused injury or illness, included inadequate instructions for use or included inadequate warnings concerning possible side effects or interactions with other substances. A product liability claim or regulatory action against the Company could result in increased costs, could adversely affect the Company's reputation with its clients and consumers generally, and could have a material adverse effect on the business, results of operations, financial condition or prospects of the Company. There can be no assurances that the Company will be able to maintain product liability insurance on acceptable terms or with adequate coverage against potential liabilities. Such insurance is expensive and may not be available in the future on acceptable terms, or at all. The inability to maintain sufficient insurance coverage on reasonable terms or to otherwise protect against potential product liability claims could prevent or inhibit the commercialization of the Company's potential products or otherwise have a material adverse effect on the business, results of operations, financial condition or prospects of the Company

*Product Approvals*

The Company may require advance approval of its products from federal, state, and/or local authorities. While the Company intends to follow the guidelines and regulations of each applicable federal,

A-6

\4862-6139-5226

**KW2_103109**

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

state, and/or local jurisdiction in preparing products for sale and distribution, there is no guarantee that such products will be approved to the extent necessary. If the products are approved, there is a risk that any federal, state, and/or local jurisdiction may revoke its approval for such products based on changes in laws or regulations or based on its discretion or otherwise. If any of the Company's products are not approved or any existing approvals are rescinded, there is the potential to lead to a material adverse effect on the Company's business, financial condition, results of operations or prospects.

*Continued Market Acceptance by Consumers; Consumer Spending Patterns*

The Company is substantially dependent on continued market acceptance of its products by consumers. Although the Company believes that the use of products similar to the products to be designed and manufactured by the Company is gaining international acceptance, the Company cannot predict the future growth rate and size of this market.

In addition, the Company's business is sensitive to a number of factors that influence the levels of consumer spending, including political and economic conditions such as recessionary environments, the levels of disposable consumer income, consumer debt, interest rates and consumer confidence. Reduced consumer spending could have an adverse effect on the Company's operating results in future periods.

*Changes in Laws, Regulations, and Guidelines*

The Company's operations will be subject to various laws, regulations, guidelines and licensing requirements relating to the production, manufacture, sale, distribution, management, transportation, storage and disposal of hemp and hemp CBD, as well as being subject to laws and regulations relating to health and safety, the conduct of operations and the protection of the environment. While the Company is expected to be in compliance with all such laws, any changes to such laws, regulations, guidelines and policies due to matters beyond the control of the Company could have a material adverse effect on the Company's business, results of operations and financial condition. In particular, any amendment to or replacement of the Farm Bill or Sherman Food Drug and Cosmetics Act may cause adverse effects to the Company's operations. Moreover, specific packaging and labeling laws may be introduced which may further increase the expense of production.

*Product Recalls*

Manufacturers and distributors of products are sometimes subject to the recall or return of their products for a variety of reasons, including product defects, such as contamination, unintended harmful side effects or interactions with other substances, packaging safety and inadequate or inaccurate labeling disclosure. Such recalls cause unexpected expenses of the recall and any legal proceedings that might arise in connection with the recall. This can cause loss of a significant amount of sales. In addition, a product recall may require significant management attention. Although the Company will have detailed procedures in place for testing its products, there can be no

A-7

KW2_103110

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

assurance that any quality, potency or contamination problems will be detected in time to avoid unforeseen product recalls, regulatory action or lawsuits. Additionally, if one of the Company's brands were subject to recall, the image of that brand and the Company could be harmed. Additionally, product recalls can lead to increased scrutiny of operations by applicable regulatory agencies, requiring further management attention and potential legal fees and other expenses.

*Brand Awareness*

The Company's success depends in part on its ability to create and maintain brand awareness for its product offerings. This may require a significant amount of capital to allow the Company to market products and establish brand recognition and customer loyalty. Additionally, many of the companies offering similar products have already established their brand identity within the marketplace. The Company can offer no assurances that it will be successful in establishing awareness of its brands and allowing the Company to compete in this market. The importance of brand recognition will continue to increase because low barriers of entry to the industries in which the Company operates may result in an increased number of direct competitors. To promote the Company's brands, it may be required to continue to increase its financial commitment to creating and maintaining brand awareness. The Company may not generate a corresponding increase in revenue to justify these costs.

*Intellectual Property*

The Company's success is highly dependent on the existence and maintenance of its intellectual property rights in its trademarks, trade secrets, and know-how. The value to the Company of its intellectual property rights is dependent on the scope and duration of its rights as defined by applicable laws in the U.S. and abroad and the manner in which those laws are construed. If those laws are drafted or interpreted in ways that limit the extent or duration of the Company's rights, or if existing laws are changed, its ability to generate revenue from its intellectual property may decrease, or the cost of obtaining and maintaining rights may increase.

The Company is also dependent upon the owners of intellectual property rights licensed to the Company under various license agreements to protect and defend those rights against third party claims.

If third parties take actions that affect the Company's rights, the value of its intellectual property, similar proprietary rights or reputation or the licensors who have granted the Company certain rights under license agreements, or the Company is unable to protect the intellectual property from infringement or misappropriation, other companies may be able to offer competitive products at lower prices, and the Company may not be able to effectively compete against these companies. The Company also faces the risk of claims that it has infringed third parties' intellectual property rights. Any claims of intellectual property infringement, even those without merit, may require the Company to:

- defend against infringement claims which are expensive and

A-8

\4862-6139-5226

KW2_103111

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

time consuming;

- cease making, licensing or using products that incorporate the challenged intellectual property;

- re-design, re-engineer or re-brand products or packaging; or

- enter into royalty or licensing agreements in order to obtain the right to use a third party's intellectual property.

*Supply Chain Risks*

The Company is subject to the risks inherent in manufacturing its products, including industrial accidents, environmental events, strikes and other labor disputes, disruptions in supply chain or information systems, loss or impairment of key manufacturing sites or suppliers, product quality control, safety, increase in commodity prices and energy costs, licensing requirements and other regulatory issues, as well as natural disasters and other external factors over which the Company has no control. If such an event were to occur, it could have an adverse effect on the Company's business and financial results.

*Third Party Manufacturing*

Some of the Company's products are manufactured or compounded by unaffiliated third parties. The Company does not have any long-term contracts with any of these third parties, and expects to compete with other companies for raw materials, production and import capacity. If the Company experiences significant increased demand, or needs to replace an existing manufacturer, there can be no assurance that additional manufacturing capacity will be available when required on terms that are acceptable to the Company, or at all, or that any manufacturer or compounder would allocate sufficient capacity to the Company in order to meet its requirements. In addition, even if the Company is able to expand existing or find new sources, the Company may encounter delays in production and added costs as a result of the time it takes to engage third parties. Any delays, interruption or increased costs in the manufacturing or compounding of the Company's products could have an adverse effect on its ability to meet retail customer and consumer demand for our products and result in lower revenues and net income both in the short and long-term.

*Brand Acquisition Strategy*

A component of the Company's growth strategy is the acquisition of additional brands and trademarks. The Company generally competes with traditional consumer brand companies, other brand management companies and private equity groups for brand acquisitions. However, as more of the Company's competitors continue to pursue our brand management model, competition for specific acquisition targets may become more acute, acquisitions may become more expensive and suitable acquisition candidates could become more difficult to find. In addition, even if the Company successfully acquires additional trademarks or the rights to use additional trademarks, the Company may not be able to achieve or maintain profitability levels that justify its investment in, or realize planned

A-9

\4862-6139-5226

KW2_103112

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

benefits with respect to, those additional brands.

In addition, acquisition of brands or trademarks transactions involve a number of risks and present financial, managerial and operational challenges, including: diversion of management's attention from running the existing business; unanticipated costs associated with the target acquisition, appropriately valuing the target acquisition and analyzing its marketability, increased expenses, including legal and administrative expenses; integration costs related to the customer base and business practices of the acquired company with the Company's own; and adverse effects on the Company's reported operating results due to possible write-down of goodwill and/or identifiable intangibles associated with acquisitions.

When the Company acquires intellectual property assets or the companies that own them, the due diligence reviews are subject to inherent uncertainties and may not reveal all potential risks. Although the Company generally attempts to seek contractual protections through representations, warranties and indemnities, the Company cannot be sure that it will obtain such provisions in its acquisitions or that such provisions will fully protect the Company from all unknown, contingent or other liabilities or costs. Finally, claims against the Company relating to any acquisition may necessitate seeking claims against the seller for which the seller may not, or may not be able to, indemnify the Company or that may exceed the scope, duration or amount of the seller's indemnification obligations.

**_Risks Related to Ecogen Acquisition_**

In August 2020, the Company purchased substantially all of the assets of EcoGen, Inc., a global manufacturer and supplier of hemp-derived CBD materials and formulations. While the transaction was structured as an asset purchase and the Company only agreed to assume certain specifically negotiated liabilities of EcoGen, Inc., under the purchase agreement, the Company has extremely limited recourse against EcoGen, Inc. and its owners in the event that a creditor or other third party makes any legal claim against the Company (based on a successor liability theory or otherwise) for liabilities of EcoGen, Inc. to such creditor or other third party.

On February 1, 2022, the Company received notice that Unite Private Networks, LLC had filed suit in federal court against Ecogen Biosciences, LLC and the Company that relate to actions by EcoGen, Inc. prior to the Company's acquisition of substantially all the assets of EcoGen, Inc. The plaintiff in such lawsuit has made a claim for damages equal to $64,668.71. The Company believes that once the plaintiff learns that neither Ecogen Biosciences nor the Company is a viable defendant, it will dismiss the lawsuit entirely. Assuming a dismissal is not immediate, while the Company believes it would be successful in defending such lawsuit, it is possible that the Company could be found liable for the full amount of such damages as the successor in interest of EcoGen, Inc.

A-10

KW2_103113

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

| | |
|---|---|
| *Risks Related to Newberry Litigation* | On December 4, 2020, the Company terminated the employment of Brian Newberry, one of the original founders of the Company and a former Member and Manager. The Company also exercised certain rights to repurchase from Mr. Newberry his 8,564,167 vested Common Units and 350,001 vested Service Units in the Company at a discounted price due to his termination for cause. |
| | On January 26, 2021, Mr. Newberry threatened to file a lawsuit against the Company (among other defendants) alleging 13-causes of action relating to his former employment with the Company, including retaliation, wrongful termination, breach of contract, and defamation. Newberry asserts, among other things, that the Company did not have the right to repurchase his equity on the terms applicable to "for cause" terminations. |
| | While the Company believes it will be successful in defending such litigation, if the Company were to be found liable to Mr. Newberry for any or all of the allegations he has asserted against the Company, this would likely have a material adverse effect on the Company's financial condition and prospects going forward. In addition, if Mr. Newberry is successful in his assertion that the Company did not have the right to repurchase his equity in accordance with the provisions governing a "for cause" repurchase of Units, it is possible that his equity would still be considered issued and outstanding, which would dilute the equity ownership of our existing stockholders. Alternatively, it is possible that the Company may be required to repurchase his equity interests at their fair market value rather than at the previously paid discounted price, which could significantly and adversely impact the Company's financial condition and prospects going forward. |
| *Risks Related to EPA Investigation* | The United States Environmental Protection Agency (the "EPA") is currently conducting an investigation of the activities of the former owner of the EcoGen, Inc. assets that the Company acquired in August of 2020. The operations of the Company are not conducted on the same parcels of real property that were owned or leased by EcoGen, Inc. While the Company is currently cooperating with the investigation and is currently not a target of the EPA's investigation, the Company does not currently have sufficient information to determine if it has any exposure in this matter. If the Company becomes a target of the EPA investigation, the Company may have to expend significant resources to defend itself in connection with such an investigation. Any ultimate fines, penalties or cleanup obligations imposed on the Company as a result of the EPA's investigation could be significant, and if imposed, could cause a material adverse effect on the Company's liquidity and results of operations. |
| *Risks Related to Potential ISSS Litigation* | Certain disputes have arisen between the Company, on the one hand, and Brian Newberry, Glenn Russell and Eric Johnson regarding the Company's contractual relationship with Integrated Strategic Support Services, LLC ("ISSS"), disclosures made by these individuals during the Company's acquisition of the ISSS business in 2020, and other anti-competitive conduct following the 2020 |

A-11

\4862-6139-5226

KW2_103114

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

transaction. Arbitration proceedings are currently pending regarding these disputes, and the Board of Directors of the Company voted to remove Glenn Russell from the Board of Directors in response to these issues. If such arbitration proceedings continue or devolve into further litigation, the Company may have to expend significant resources in connection with such litigation, which could significantly and adversely impact the Company's financial condition and prospects.

## RISKS RELATED TO OFFERING AND SECURITIES

| | |
|---|---|
| *Returns are Not Guaranteed and the Company May Not Receive Sufficient Cash to Make Distributions.* | The returns on the Shares are neither a fixed return on investment, nor are they a guaranty of a certain return on shareholders' capital contributions. The Company will use the proceeds from the sale of the Shares for working capital and to pay Company expenses. Although the Company believes it will eventually be able to make distributions to its Shareholders or otherwise achieve a liquidity event for its Shareholders, it cannot provide any assurance that it will receive sufficient proceeds to be able to make any distributions. |
| *The price of the Shares in the Company has been established arbitrarily and may not reflect the current fair market value thereof.* | The price of the Shares in the Company has been established arbitrarily. Such price is not based on net worth, earnings or other traditional criteria of value. No effort has been made to obtain independent advice regarding the valuation of the Company, as may be implied by the price of the Shares in the Company. Each Shareholder and each prospective investor is urged to make an independent evaluation of the fairness of the offering price. |
| *There is no market for the Shares.* | The Shares being sold in this offering have not been registered under the Securities Act, or registered or qualified under any applicable state securities laws, and, therefore, cannot be sold unless they are subsequently registered under the Securities Act and registered or qualified under applicable states securities laws or an exemptions from such registration and qualification are available. It is not contemplated that registration under the Securities Act or any registration or qualification under applicable state securities laws will ever be effected. There is no public market for Shares in the Company and one is not expected to develop. Each Shareholder must continue to bear the economic risk of the investment for an indefinite period |
| *There are substantial transferability restrictions associated with the Shares.* | The Shareholder Agreement imposes substantial restrictions upon the transferability of the Shares. Each Shareholder must continue to bear the economic risk of the investment for an indefinite period. |
| *The tax aspects of an investment in the Company are complicated.* | The Company is not advising any Shareholder regarding the tax implications of acquiring and holding the Shares. Each investor is urged to consult with the investor's independent tax advisor regarding the tax consequences of investing in the Shares before making its investment. |
| *There can be no assurance that the Company will be* | There can be no assurance that the Company will be successful or achieve its objectives, or, if it is successful, that a Shareholder will |

A-12

\4862-6139-5226

KW2_103115

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

*successful or achieve its objective or that an investor will not lose its entire investment.*

receive a certain return on its investment. The Shareholders must be able to afford the loss of their entire investment.

*The Company would face significant financial or other hardships if any non-Accredited Investor subscribes for Shares.*

The Shares are being offered and sold without securities registration in reliance on the transactional securities registration exemption set forth in Rule 506(b) of Regulation D promulgated thereunder. As a result, the Shares can only be sold to "accredited investors" as that term is defined in Rule 501 of Regulation D. If Shares are sold to a non-accredited investor in violation of the Securities Act, and if the offering of the Shares did not qualify for exemption under any other exemption, the securities would have been sold in violation of Section 5 of the Securities Act. Both federal and state law include provisions under which purchasers of unregistered, non-exempt securities may seek damages amounting to the return of their investments and other damages. The Company may not have funds sufficient to repay investors without severely jeopardizing the prospects for success.

A-13

\4862-6139-5226

KW2_103116

DocuSign Envelope ID: 7CE8159B-3C89-463C-AE37-18AC2C6FFEB9

**Appendix B**

**JOINDER AGREEMENT TO SHAREHOLDER AGREEMENT OF KADENWOOD, INC.**

[See attached]

B-1

\4862-6139-5226

KW2_103117

## JOINDER AGREEMENT
## TO THE
## SHAREHOLDER AGREEMENT
## OF
## KADENWOOD, INC.

This Joinder Agreement ("Joinder Agreement") is made as of the date written below by the undersigned (the "Joining Party") in accordance with the Shareholder Agreement of Kadenwood, Inc., dated as of June 7, 2021 (the "Shareholder Agreement"), as the same may be amended from time to time. Capitalized terms used herein but not defined shall have the meaning ascribed to such terms in the Shareholder Agreement.

The Joining Party hereby acknowledges, agrees, and confirms that, by his, her, or its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to the Shareholder Agreement as of the date of this Joinder Agreement, with the number of Shares, capital contributions, and other provisions and obligations as set forth in Exhibit A to the Shareholder Agreement, and shall have all of the rights and obligations of a Shareholder under the Shareholder Agreement as if the Joining Party had executed the Shareholder Agreement. The Joining Party hereby ratifies, as of the date of this Joinder Agreement, and agrees to be bound by, all of the representations, warranties, terms, provisions, and conditions contained in the Shareholder Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

**JOINING PARTY:**

**If an individual**:

By: _____

Print Name: _____

Date: _____ __, 20__

**If an entity**:

Name of Entity: R&R AZ Investments, LLC

By: *Brent Roland*
EF718FE39D45417...
Print Name: Brent Roland

Title: Managing Partner

Date: 3/31/2022

4832-7918-6617
\4862-6139-5226

KW2_103118